Juanita E. FOSTER, Plaintiff–Appellant,

v.

ARTHUR ANDERSEN, LLP, Defendant–Appellee.

No. 98–1246.

United States Court of Appeals, Seventh Circuit.

Argued Oct. 29, 1998.

Decided Feb. 23, 1999.

Matthew J. Iverson (argued), Burditt & Radzius, Chicago, IL, for Plaintiff–Appellant.

Jeffrey J. Ward, Keck, Mahin & Cate, Chicago, IL; John A. McDonald (argued), James Y. Wu, McDermott, Will & Emery, Chicago, IL, for Defendant–Appellee.

Before POSNER, Chief Judge, and WOOD, JR. and MANION, Circuit Judges.

MANION, Circuit Judge.

Juanita Foster, a black woman with carpal tunnel syndrome, sued her former employer, Arthur Andersen, LLP, alleging racial and disability discrimination. The district court granted Andersen summary judgment because Foster failed to establish a prima facie case of discrimination on both claims. We affirm.

## I. Background

On January 3, 1983, Juanita Foster began working for Andersen as a word processing specialist in the Central Word Processing Department of its Chicago, Illinois office. Andersen is engaged in the business of accounting, tax consulting, and general business consulting. In 1991, Foster was promoted to "work coordinator," which entailed typing and supervising the work of seven or eight word processing specialists. When restructuring occurred in February 1994, Foster became a "senior specialist," which required her to spend 90–95% of her time typing. On March 4, 1994, Foster's supervisor—Florence Castillo—placed her on "final warning status" for one year, purportedly because of insubordination. Around this time she was also warned by an Andersen official—Andrea Leathers—that she would be terminated if her attitude and performance did not improve. On January 31 and February 1, 1995, while Foster was still on final warning status, her new supervisor—Nancy Eichenlaub—met with her to discuss continuing problems with her attitude. Foster's final warning status was renewed in September 1995, purportedly due to "overall poor performance" and her failure to improve. Around September 13, 1995, Foster was assigned a new supervisor—Virginia Jones. A few days later, on September 18, 1995, Foster met with another Andersen official—Gary Beu—who counseled her about her continued need to improve in certain areas. Foster testified at deposition that she understood she was on final warning status

at this time, and that if she did not improve she would be terminated.

On September 20, 1995, two days after meeting with Beu, Foster came to work about five minutes late and with a splint on her hand. Jones inquired whether she had carpal tunnel syndrome, but Foster responded that she only had tendinitis.[1] Notably, Foster did not request any accommodation or change in duties, although she was still typing 90–95% of her working day. On October 25, Foster was almost an hour late for work (due to a doctor's appointment scheduled for 8:20 a.m.), despite Andersen's policy regarding tardiness.[2] Foster admits that she knowingly failed to abide by Andersen's requirement that tardy employees call their supervisors to inform them that they will be late within thirty minutes after their scheduled start time. She asserts, however, that she was "at most, six minutes late" in informing Andersen of the delay and that she originally did not anticipate that her 8:20 appointment would cause her to be late for work. Furthermore, while she intended to call Jones earlier, Foster explained that she was on the telephone at her doctor's office setting up an appointment for a bone scan and an MRI. When she eventually called Jones, no later than 9:06 a.m., they had an unfriendly exchange of words, resulting in Jones complaining to Foster that she "had an attitude problem."

Foster eventually arrived at work between 9:15 and 9:30 a.m. and presented a note from her physician—Dr. Samuel Chmell—recommending that she be placed on light typing duty because of her condition, which was then thought to be multiple tendinitis, but which later was diagnosed as carpal tunnel syndrome. In a meeting that day with Jones, who is black, and Eichenlaub, who is white, Foster was suspended for thirty days without pay, allegedly due to her violation of company policies. Later that same day, Jones and Eichenlaub met with the Director

---

1. Carpal tunnel syndrome is "a complex of symptoms resulting from the compression of the median nerve in the carpal tunnel, with pain and burning or tingling paresthesias [an abnormal sensation] in the fingers and hand, sometimes extending to the elbow." Dorland's Illustrated Medical Dictionary 1626 (28th ed.1994). Tendinitis is an "inflammation of the tendons and of tendon-muscle attachments." *Id.* at 1667.

2. Foster's normal start time was 8:30 a.m.

of Personnel Administration—Eileen Dowd—and recommended Foster's termination.[3] Dowd agreed that Foster's termination was warranted, and on the next day, October 26, 1995, Jones informed Foster that she was being discharged for failing to follow company procedures. The day following her termination, Foster filed a charge of discrimination with the Illinois Department of Human Rights and the EEOC, alleging that she was suspended and discharged because of her disability. Subsequently, on June 7, 1996, she amended her charge by complaining that her suspension and discharge were also the result of racial discrimination. Foster initiated this suit on September 17, 1996, and Andersen moved for summary judgment on June 20, 1997. On December 29, 1997, the district court granted Andersen's motion, holding that Foster failed to establish the causation prong of a prima facie case of "failure to accommodate" disability discrimination and failed to establish the satisfactory performance and disparate treatment prongs of a prima facie case of race discrimination. *See Foster v. Arthur Andersen, L.L.P.,* No. 96 C 5961, 1997 WL 802106 (N.D.Ill. Dec. 29, 1997).

## II. Discussion

### A. *Disability Discrimination*

Foster claims that Andersen failed to reasonably accommodate her disability, carpal tunnel syndrome.[4] The ADA prescribes discrimination "against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, ... and other terms, conditions and privileges of employment." 42 U.S.C. § 12112(a). Under the ADA, two distinct categories of disability discrimination claims exist: failure to accommodate and disparate treatment. *Sieberns v. Wal–Mart Stores, Inc.,* 125 F.3d 1019, 1021–22 (7th Cir.1997). In reasonable accommodation claims, a prima facie case mirrors the statutory elements. The statute provides that an employer discriminates against a qualified individual with a disability by "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability ...." 42 U.S.C. § 12112(b)(5)(A). Accordingly, to state a prima facie case of "failure to accommodate" disability discrimination, a plaintiff who has suffered an adverse employment action must show that: (1) she was or is disabled; (2) the defendant was aware of her disability; (3) she was otherwise qualified for her job, *Bultemeyer v. Fort Wayne Community Sch.,* 100 F.3d 1281, 1284 (7th Cir.1996); *Beck v. Univ. of Wisconsin Bd. of Regents,* 75 F.3d 1130, 1134 (7th Cir.1996); and (4) the disability caused the adverse employment action (a factor which is implied if not stated).[5] *See* 42 U.S.C. § 12112(a) (no entity shall discriminate against a qualified individual "because of the disability").[6] This

---

3. The record also contains material concerning Foster's purported violations of Andersen's lunch policy. Because the parties dispute the facts surrounding the incident, the district court did not consider this allegation in making its decision, nor do we.

4. It is apparent from the record that Andersen did not know that Foster had carpal tunnel syndrome until after she was terminated, as Foster's ailment was not diagnosed as carpal tunnel syndrome until after her departure from Andersen. We have previously held that " 'an employer cannot be liable under the ADA for firing an employee when it indisputably had no knowledge of the disability.' " *Adkins v. Briggs & Stratton Corp.,* 159 F.3d 306, 307 (7th Cir.1998) (quoting *Hedberg v. Indiana Bell Tel. Co.,* 47 F.3d 928, 932 (7th Cir.1995)). Because Andersen did not raise this issue, however, we decline to address it here.

5. Of course, the elements of a prima facie case vary and may be stated in different ways.

*McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802 n. 13, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Notably, causation is one of the explicitly articulated elements of a prima facie case of disparate treatment disability discrimination. *See Weigel v. Target Stores,* 122 F.3d 461, 465 (7th Cir.1997).

6. Other circuits have explicitly stated that causation is an element of a prima facie case of disability discrimination which the plaintiff must establish. *See Feliciano v. Rhode Island,* 160 F.3d 780, 784 (1st Cir.1998) (ADA plaintiff alleging failure to accommodate must show that "the employer discharged him or her in whole or in part because of that disability"); *Gaul v. Lucent Tech. Inc.,* 134 F.3d 576, 580 (3d Cir.1998) (for prima facie case of failure to accommodate discrimination the plaintiff must show that he "suffered an otherwise adverse employment decision as a result of discrimination"); *Halperin v. Abacus Tech. Corp.,* 128 F.3d 191, 197 (4th Cir. 1997); *Pritchard v. Southern Co. Servs.,* 92 F.3d

fourth element is frequently left unstated because employers will concede that the disability was the reason for the job action but will argue the "otherwise qualified" or "reasonable accommodation" issues. *Foster,* 1997 WL 802106, at \*4 n. 5. Our prior decisions on adverse action recognize that "because of the disability" is an element of the prima facie case. Hence, an employee cannot state a cause of action for disability discrimination where his employer terminated him for reasons unrelated to (*i.e.,* not because of) his disability. *See Hedberg,* 47 F.3d at 934. Accordingly, to state a prima facie case of disability discrimination for failure to accommodate the disability, a plaintiff must demonstrate all four of the elements listed above, including the claim that she was discharged because of her disability.

This last element is significant here because Andersen asserts that it discharged Foster because of her violation of company policy, not because of her disability. So we need to determine what the ADA's term "because of the disability" proscribes, and what a plaintiff must prove in order to establish that she was terminated for that reason. To help sort out the proper meaning of that phrase, we look to analogous statutes that use similar language. *See United States v. Bates,* 96 F.3d 964, 968 (7th Cir.1996), *aff'd,* 522 U.S. 23, 118 S.Ct. 285, 139 L.Ed.2d 215 (1997). The most analogous statute is Title VII, which also uses the "because of" language.[7] *See* 42 U.S.C. § 2000e–2(a)(1). Congress gave some assistance in determining the meaning of this term in the Civil Rights Act of 1991, which states that an impermissible consideration must not be "a motivating factor" of an employment decision. Civil Rights Act of 1991 § 107(a), Pub.L. No. 102–166, 105 Stat. 1071, 1075 (1991) (codified at 42 U.S.C. § 2000e–2(m)). This statute is not, by its own terms, specifically applicable to ADA cases, as Congress omitted the ADA from the purview of Section

107 of the Civil Rights Act. Nevertheless, several circuits have adopted this language in holding that an ADA plaintiff must show that a "disability (or perception or record thereof) was a motivating factor in the decision to dismiss ...." *Newberry v. East Texas State Univ.,* 161 F.3d 276, 279 (5th Cir.1998); *accord Doane v. City of Omaha,* 115 F.3d 624, 629 (8th Cir.1997); *Katz v. City Metal Co., Inc.,* 87 F.3d 26, 33 (1st Cir.1996); *Tyndall v. National Educ. Ctrs., Inc. of California,* 31 F.3d 209, 214 (4th Cir.1994); *cf. Roth v. Lutheran Gen. Hosp.,* 57 F.3d 1446, 1457 n. 17 (7th Cir.1995) (noting that the plaintiff's disability was not the factor motivating the adverse action). Likewise, the "motivating factor" standard is relevant in this case.

■■■ The next question is when does a detrimental job action, where disability was a consideration, rise to the level of a motivating factor, thus triggering a violation of the ADA. "A" motivating factor (as opposed to "the" motivating factor) obviously means that the discriminatory factor, here the alleged disability, need not be the employer's only reason for termination. *Fields v. New York State Office of Mental Retardation & Dev. Disabilities,* 115 F.3d 116, 120 (2d Cir.1997) (citing *Sherkow v. Wisconsin,* 630 F.2d 498, 502 (7th Cir.1980)). But it must be a substantial factor. Mere awareness of the plaintiff's disability, or simply thinking about it in discriminatory terms, is not enough. *See Price Waterhouse v. Hopkins,* 490 U.S. 228, 262, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989) (O'Connor, J., concurring) (discrimination statutes do not regulate discriminatory thoughts). Rather, the impermissible consideration must contribute to the adverse employment decision in some substantial way. *Owen v. Thermatool Corp.,* 155 F.3d 137, 139 (2d Cir.1998) (noting that the "words 'substantial' and 'motivating' are reasonably interchangeable or at least have considerable overlap"). To be a motivating factor, then, the forbidden criterion must be a significant

---

1130, 1132 (11th Cir.1996) (prima facie case requires showing that plaintiff "was discriminated against because of the disability"), *amended on rehearing in part,* 102 F.3d 1118; *White v. York Int'l Corp.,* 45 F.3d 357, 360–61 (10th Cir. 1995) (prima facie case of failure to accommodate discrimination entails a showing "that the

employer terminated him because of his disability").

7. The Rehabilitation Act is unhelpful as it prohibits discrimination against a person "solely by reason of her or his disability." 29 U.S.C. § 794(a).

reason for the employer's action. It must make such a difference in the outcome of events that it can fairly be characterized as the catalyst which prompted the employer to take the adverse employment action, and a factor without which the employer would not have acted. *See Luciano v. Olsten Corp.,* 110 F.3d 210, 219 (2d Cir.1997).

▇▇▇ Applying these principles, we focus on Foster's specific allegations. She points to Jones' inquiry, upon seeing Foster's hand splint, of whether Foster had carpal tunnel syndrome. Foster told her "no," she had tendinitis. A month later (the day before Foster was terminated) when she arrived late for work, Foster presented a doctor's recommendation that she be placed on light typing duty. Foster cites these incidents as reasons why Andersen reacted to her disability and fired her. The district court considered these facts in conjunction with Andersen's longstanding complaints about Foster's performance. It also considered Foster's admission that she was on final warning status and had recently been warned that a single misstep would result in termination. Despite these warnings, Foster readily admits that she was late for work and that she violated Andersen's policies by failing to inform Andersen of her tardiness within thirty minutes of her scheduled start time. Considering all of the evidence, the district court reasonably found that Foster failed to create a triable issue concerning whether her request for an accommodation was a factor that motivated Andersen to terminate her. In short, the court determined that her termination did not occur "because of" her disability.[8]

▇▇▇ Foster turns to the fact that little time elapsed between her giving notice of her tendinitis with the doctor's recommendation of light duty and her termination (which occurred the next day). This "telling temporal sequence" claim is commonly used in re-

taliation cases. *See Sweeney v. West,* 149 F.3d 550, 557 (7th Cir.1998) (discussing temporal analysis in retaliation context). Here, Foster insists that the minimal time that elapsed between her request for an accommodation and her termination is sufficient in itself to satisfy the causation prong of a prima facie case. That is, Foster argues that because Andersen terminated her one day after her requesting an accommodation, this time-frame is a per se indication that she was terminated because of her disability. In addressing this argument, we should first mention that the temporal sequence analysis is not a magical formula which results in a finding of a discriminatory cause. We have said that "suspicious timing does constitute circumstantial, or indirect, evidence to support a claim of discrimination." *Hunt–Golliday v. Metropolitan Water Reclamation Dist. of Greater Chicago,* 104 F.3d 1004, 1014 (7th Cir.1997) (retaliation). But it is also true that the "timing of the complaints, standing alone, does not create a genuine issue as to causal connection" where the plaintiff "could not prove that she was terminated because of her sexual harassment complaint rather than for poor work performance." *Juarez v. Ameritech Mobile Communications, Inc.,* 957 F.2d 317, 321 (7th Cir.1992). So even if we were to apply this analysis to her claim, Foster would have to show more than just temporal proximity. She fails to do so because she has not linked her tendinitis (which, as we mentioned, was only later diagnosed as carpal tunnel syndrome) to Andersen's decision to fire her. After examining the record, we conclude as the district court did, "the timing of the discharge decision is the only tile in Foster's mosaic; she gives us no other circumstantial evidence from which we might infer that Andersen acted with an improper motive." *Foster,* 1997 WL 802106, at *7.

---

8. Although the district court did not rely on this factor, we note that in ADEA cases we have held that mere inquiry about retirement does not amount to evidence of unlawful conduct. *See Colosi v. Electri–Flex Co.,* 965 F.2d 500, 502 (7th Cir.1992). The rationale for this rule is that companies must plan for the future, "and it would be absurd to deter such inquiries by treating them as evidence of unlawful conduct." *Id.*

Similarly, because employers are required by law to accommodate disabled employees, and such accommodation often requires some advance planning, it is equally absurd to impute guilt to employer who wisely seeks to ascertain whether an employee is disabled and possibly in need of an accommodation. *See Cox v. Dubuque Bank & Trust Co.,* 163 F.3d 492, 497 (8th Cir.1998).

## B. Race Discrimination

 Foster also alleges that Andersen discharged her because of her race.[9] Title VII provides that "[i]t shall be an unlawful employment practice for an employer—(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race ...." 42 U.S.C. § 2000e–2(a)(1). Utilizing the *McDonnell Douglas* burden-shifting framework, a plaintiff establishes a prima facie case of race discrimination by showing that: (1) she was a member of a protected class; (2) she was qualified for the job in question or was meeting her employer's legitimate performance expectations; (3) she suffered an adverse employment action; and (4) the employer treated similarly situated employees outside the class more favorably. *Bragg v. Navistar Int'l Transp. Corp.*, 164 F.3d 373, 376 (7th Cir.1998).

 The district court found that Foster failed to establish the second and fourth elements. As to the satisfactory performance of her job, we noted above that Foster was on final warning status for a considerable time, due to perceived problems with her attitude and performance. Foster also knew that while she was on final warning status even the slightest infraction could result in her termination. Furthermore, she knew that she would be terminated if she did not take affirmative steps to improve her attitude and performance. In an attempt to counter her negative performance status, Foster submitted an affidavit by Donna Racek Cuesta—a fellow employee in Andersen's word processing department—in which she stated that "I never observed Ms. Foster violate any of Arthur Andersen's policies." Cuesta's affidavit gets Foster nowhere. It does not state how or why she might observe Foster's work activities. Beyond that, in her own testimony Foster admits that she violated Andersen's policy requiring employees to provide prompt notice when they are late for

work. Cuesta obviously did not know what Foster did before she arrived late on October 25. Nor does Foster even claim that she was improving, something Andersen required in order for her to continue her employment.

 So what does this have to do with race? Foster attempts to argue that some of Andersen's complaints which led to her final warning status were based on racial animus, but she does not specify which ones. She also concedes that more than one supervisor renewed her final warning status—a status that she seems to admit was warranted under company policy. Foster unquestionably was on final warning status when she was late for work on two occasions, and failed to notify Andersen that she would be late on one of those occasions. Even under Foster's version of events, she did not meet her employer's legitimate expectations. She assumes the motive for discharge must have been race because, in her opinion, her violation of Andersen's policies on October 25, 1995 was inconsequential. Perhaps it was inconsequential; maybe the policy is even petty. But Title VII does not prohibit employers from making employment decisions based on that which an employee considers to be a *de minimis* infraction. *See Cowan v. Glenbrook Sec. Serv., Inc.*, 123 F.3d 438, 445 (7th Cir.1997) (finding no racial discrimination even though the plaintiff was discharged for repeated tardiness after being warned he would be fired if he were only one minute late). As we often repeat, we do not sit as a super-personnel department that reexamines an employer's personnel decisions; we will not second-guess an employer's policies that are facially legitimate. *See Debs v. Northeastern Illinois Univ.*, 153 F.3d 390, 396 (7th Cir.1998). Because a requirement that employees promptly notify their supervisors when they are going to be late is facially legitimate, and Foster concedes that she did not do so, she did not meet Andersen's legitimate employment expectations and cannot establish a prima facie case.

---

9. To the extent that Foster also complains about her failure to receive a promotion in 1990 and a reprimand she received in February 1995, these incidents occurred well beyond 300 days prior to her filing of a charge of discrimination and cannot be the basis of a discrimination claim. *See* 42 U.S.C. § 2000e–5(e).

Finally, as to the fourth element, Foster admitted that she had no evidence of Jones, her supervisor, treating non-blacks more favorably than black employees. Rather, Foster alleges that in 1990, Andersen awarded a promotion to a white employee instead of her. Aside from the fact that it occurred five years before her termination, Foster has not demonstrated that Andersen did not terminate any non-black employees for infractions similar to Foster's while they were on final warning status. Without such a showing or a demonstration of comparable disparity, she cannot establish the disparate treatment element of a prima facie case. Therefore, the district court was correct in finding that Foster failed to establish a prima face case of race discrimination. Because of this, and Foster's failure to establish a prima facie case of disability discrimination, the district court properly granted summary judgment for Andersen.

AFFIRMED.