**Mary L. SEISSER, Plaintiff,**

v.

**PLATZ FLOWERS AND SUPPLY, INC., Defendant.**

**No. 98 C 7414.**

United States District Court, N.D. Illinois, Eastern Division.

May 9, 2000.

## MEMORANDUM OPINION AND ORDER

SHADUR, Senior District Judge.

Mary Seisser ("Seisser") has sued her ex-employer Platz Flowers and Supply, Inc. ("Platz"), claiming that she was discharged or "constructively discharged" [1] because of her poor vision in violation of the Americans with Disabilities Act (42 U.S.C. §§ 12101 to 12117).[2] Platz has moved for summary judgment under Fed. R.Civ.P. ("Rule") 56. Both sides have complied with this District Court's LR 56.1,[3] and Platz's motion is now fully briefed and ready for decision. For the reasons set out in this memorandum opinion and order, the motion is denied.

### Summary Judgment Standards

Familiar Rule 56 principles impose on Platz the burden of establishing the lack of a genuine issue of material fact (*Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). For that purpose this Court must "read[ ] the record in the light most favorable to the

---

1. Whether Seisser was actually discharged, constructively discharged or merely took early retirement on a voluntary basis is at the heart of this action. Seisser's Complaint alleges that "she was constructively discharged" (Complaint ¶ 1) and that she was "forced ... to take early retirement" (*id.* ¶ 11). As the discussion here reflects, Platz really rests its current position on an improperly perceived inconsistency between those two statements.

2. Further ADA citations will take the form "Section—," using the Title 42 numbering rather than ADA's internal section numbers.

3. LR 56.1(a) and 56.1(b) are designed to facilitate the resolution of Rule 56 motions by calling for evidentiary statements and responses to such statements (in each instance with record citations), thus highlighting the existence or nonexistence of factual disputes. This opinion cites to Platz's LR 56.1(a) statement of facts as "P. St. ¶ —," to Seisser's LR 56.1(b)(3)(A) response as "S. Resp. ¶ —," to Seisser's LR 56.1(b)(3)(B) statement of additional facts as "S. St. ¶ —" and to Platz's response to those additional facts as "P. Resp. ¶ —." Citations to the parties' other submissions will also use the "P." and "S." designations.

non-moving party," although it "is not required to draw unreasonable inferences from the evidence" (*St. Louis N. Joint Venture v. P & L Enters., Inc.*, 116 F.3d 262, 265 n. 2 (7th Cir.1997)). As *Pipitone v. United States*, 180 F.3d 859, 861 (7th Cir.1999) has more recently quoted from *Roger v. Yellow Freight Sys., Inc.*, 21 F.3d 146, 149 (7th Cir.1994):

> A genuine issue for trial exists only when a reasonable jury could find for the party opposing the motion based on the record as a whole.

That "general standard is applied with added rigor in employment discrimination cases, where intent is inevitably the central issue" (*McCoy v. WGN Continental Broad. Co.*, 957 F.2d 368, 370–71 (7th Cir. 1992)). However, neither "the mere existence of some alleged factual dispute between the parties" (*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)) nor the existence of "some metaphysical doubt as to the material facts" (*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)) will defeat a summary judgment motion.

What follows in the *Facts* section (and in any later factual discussion) is culled from the parties' submissions. And as with every summary judgment motion, this Court accepts nonmovant Seisser's version of any disputed facts where it is arguably supported by the record.

### Facts

Seisser was hired by Craig Thoren ("Thoren") to work for Platz in 1978 (S.Resp.¶1). In 1985 Seisser followed Thoren from Elgin to Morton Grove, Illinois when he was promoted to General Manager (*id.* ¶2). While she initially acted as an "office supervisor," in 1991 Seisser became Thoren's assistant (Seisser Dep. 12–13). As such, her duties related to "insurance benefits, collections, accounts receivable, writing promissory notes, [and] doing any of the special projects that [Thoren] needed done" (*id.* 13).

In 1995 Thoren became Platz' CEO (S.Resp.¶2). In that same year Seisser had a toe and part of her foot amputated as a result of an injury (S.St.¶4). That procedure also revealed a heart problem that necessitated heart surgery as well (*id.* ¶5). Undiagnosed diabetes was the cause of both the heart problem (P. St.¶7) and Seisser's subsequently impaired vision (Seisser Aff. ¶5). During that period Platz and Thoren adequately accommodated Seisser's health problems.[4]

By October 1995 Seisser's vision problems had made work difficult for her (S.St. ¶7), and her eyesight ultimately deteriorated to a point where she was legally blind (P. St.¶8).[5] Platz reimbursed Seisser for her purchase of a magnifying screen for her computer and later purchased her a larger computer monitor (S.Resp.¶19). While Seisser was again working full time by January 1996 (Seisser Dep. 33), a portion of her duties were then performed by Thoren (P. St.¶¶21–23). In that same month Seisser asked Thoren to have the Department of Rehabilitative Services ("DORS") evaluate her disability and her duties to determine what if anything could be done to assist her. Thoren's response "was a flat outright no" (Seisser Dep. 62).[6]

In May 1996 Seisser again asked that Thoren allow DORS or some other agency

---

4. For example, Seisser received full pay while on medical leave (S.St.¶8) and while working part time (P. St.¶17), and other persons at work carried papers for Seisser to limit her time on her feet (*id.* ¶18).

5. Seisser Aff. ¶5 says that she was diagnosed with diabetic retinopathy in September 1995 and that her vision deteriorated until August 1996, when it stabilized.

6. P. Resp. ¶12 denies that characterization, though admitting that Platz wanted to avoid a DORS inspection:

> Thoren replied that the company had just been through an OSHA audit and asked if they couldn't handle her situation between them without involving government agencies.

As stated earlier, for present purposes Seisser's version must be credited.

to evaluate her situation and make recommendations (S.St.¶ 12). Seisser says that Thoren again responded negatively, stating that a government agency might require wheelchair ramps or aisles to be widened (*id.*). Thoren asserts, however, that he agreed to Seisser's second request (P. Resp.¶ 13).[7] But the fact is that no agency ever did an evaluation, and Thoren never raised the subject with Seisser again (Thoren Dep. 62). Seisser also asked Thoren whether certain computer reports that Seisser dealt with could be drawn from the beginning of the print run so that the text would be darker. Thoren said "no," stating "that would be asking somebody to do something out of the ordinary" (S.St.¶ 13).[8]

Thoren testified that Seisser's poor eyesight resulted in performance problems. For example, she misfiled items, injected typographical errors into correspondence and miscoded bills (Thoren Dep. 35, 36–37, 39).[9] Thoren also said that Seisser suffered from a "general slowing in what she was able to do before" (*id.* 35). For her part Seisser said that her vision problems "prevent[ed][her] from performing certain tasks" (Seisser Dep. 90), but even though she admitted making more mistakes than before, she estimated that she "could perform 80 to 90 percent of [her] job functions" (*id.* 94).

On October 31, 1997 Thoren initiated a conversation with Seisser to discuss her future with Platz (S.St.¶ 14). Thoren told Seisser "I want you to take an early retirement" (*id.* ¶ 15). When asked by Seisser if there were any other options, Thoren said "no" (*id.* ¶ 16).[10] Seisser believed that she had no choice in the matter and was "forced" to retire (Seisser Dep. 47).

Thoren has offered the different spin that he "suggested" early retirement "in light of the way her health problems were" (Thoren Dep. 71). As P. Mem. 3 puts it, Thoren "could see no other way to reconcile her health and increasingly poor job performance with the company's needs."[11] Describing a conversation with Seisser about why she could not work for him any more, Thoren said (Thoren Dep. 74):

> [T]he roles had been reversed and where she was there catching my mistakes, those kinds of things had turned around.

Though Platz takes issue with labeling Seisser's departure as a "termination" (P. Resp.¶ 18), Thoren says he never gave thought to what he would do if Seisser did not accept early retirement (*id.* ¶ 19). And when asked if he felt that he terminated her employment, Thoren said "I prefer not to look at it that way" (*id.* ¶ 20a [12]). Yet Thoren says that it was his intention

7. Again Seisser's version is accepted for Rule 56 purposes. By way of explaining the disparity between the "S. St. ¶ 12" and "P. Resp. ¶ 13" citations, the Platz response to Seisser's S. St. is misnumbered from P. Resp. ¶ 3 to P. Resp. ¶ 20, resulting in responses numbered one higher than their referents. Platz then numbers two different responses as P. Resp. 20 to get back in sync.

8. P. Resp. ¶ 14 does not contest that statement for summary judgment purposes.

9. Seisser did not speak directly to those assertions because Platz's P. St. has mistakenly cited to Seisser's deposition instead of Thoren's. Seisser thus responded accurately that the stated " 'fact' is not supported by the citation."

10. It scarcely inspires confidence in Platz' presentation that it flatly denies that exchange, while stating instead (P. Resp.¶ 17):

> Thoren testified that [Seisser] asked him "if there was any other way to do that, any other alternative, and I said no, none that I could see."

This Court sees no meaningful difference between the two statements that would even arguably warrant Platz' denial of what Seisser had said.

11. On Seisser's "Termination Report" Thoren said Seisser's "dismissal" was "[d]ue to Mary's health and sight problems...." (P. Resp.¶ 21). Thoren also wrote:

> Since Mary's return from her medical leave she has not been able to resume her duties. This position needs to be more effective. I have offered Mary to be paid through the last pay period of 1997.

12. This denotes the first "P. Resp. ¶ 20" (see n. 7).

**1134**

to end Seisser's employment with Platz at that time (*id.*)—a statement entirely consistent with Seisser's testimony (Dep.49, 53–54) that he told her he had made up his mind ("I decided I was going to have to leave you") the night *before* their meeting—and Thoren specifically checked off "Dismissal" on Seisser's termination report instead of boxes labeled "Resignation" and "Mutual Agreement" (P. Resp.¶ 20b). P. Mem. 3 insists that Thoren was doing Seisser a favor because early retirement would allow for "income continuation through the company's long-term disability plan."

### Seisser's ADA Claim

▆ *Stevens v. Illinois Dep't of Transp.*, 210 F.3d 732, 735–36 (7th Cir.2000) sets out the elements required for a successful ADA case:

> To make out a claim under the ADA, an individual must show: 1) that she is disabled; 2) that she is otherwise qualified to perform the essential functions of the job with or without reasonable accommodation; and 3) that the employer took an adverse job action against her because of her disability or failed to make a reasonable accommodation.

To defeat summary judgment Seisser "need only demonstrate that there is a genuine issue of material fact regarding" any one of those elements (*Stalter v. Wal-Mart Stores, Inc.*, 195 F.3d 285, 289 (7th

Cir.1999), speaking of the comparable requirement in a Title VII case).[13]

▆ P. Mem. 5 says that Platz concedes the first element "and is even willing *arguendo* to concede the [second] element for purposes of this Motion." But those concessions were made with respect to the earlier articulation of the standards in *Foster v. Arthur Andersen, LLP*, 168 F.3d 1029, 1032 (7th Cir.1999), which made no express reference to "reasonable accommodation."[14] So Platz must be held to have conceded only the first portion of the second *Stevens* element (which tracks *Foster*'s third element): that Seisser "was otherwise qualified for her job." Though it is arguable that the notion of granting any necessary "reasonable accommodation" is implicit in a determination that Seisser was "otherwise qualified," it follows that any issue regarding reasonable accommodation is not now before this Court.

▆ Instead Platz does battle only as to the fourth *Foster* element in n. 14, arguing that it is not satisfied because Seisser "can point to no adverse employment action taken because of her disability" (P. Mem.5). Platz views Seisser's claim as being premised solely on a "constructive discharge" theory, and P. Mem. 5–6 says that Seisser cannot succeed on her claim because there is no evidence that Seisser's conditions at work were "intolerable."[15]

---

**13.** This opinion does not address the familiar *McDonnell Douglas* burden-shifting framework because, as *Lenker v. Methodist Hosp.*, 210 F.3d 792, 799 (7th Cir.2000) teaches, "when a plaintiff brings a claim under the reasonable accommodation part of the ADA, the burden-shifting method of proof is both unnecessary and inappropriate."

**14.** As *Foster, id.* put it:

> Accordingly, to state a prima facie case of "failure to accommodate" disability discrimination, a plaintiff who has suffered an adverse employment action must show that (1) she was or is disabled; (2) the defendant was aware of her disability; (3) she was otherwise qualified for her job; and (4) the disability caused the adverse employment

action (a factor which is implied if not stated).

As indicated by its citation, *Stevens* was handed down after the parties had completed their briefing here.

**15.** In the employment discrimination context "constructive discharge" normally refers to a situation "where the employer makes life so unbearable for the employee that the employee resigns" (*Patterson v. Portch*, 853 F.2d 1399, 1406 (7th Cir.1988)). As *Ludwig v. C & A Wallcoverings, Inc.* 960 F.2d 40, 43 (7th Cir.1992) describes that same most common usage, a "constructive" rather than actual discharge may exist where "employers [have] made the work environment so inhospitable for the targeted employee that he or she was effectively forced to resign."

But while Seisser's complaint uses the term "constructive discharge," it does so to describe her contention that she was "forced ... to take early retirement" (Complaint ¶ 11). Any reader must recognize that Seisser's complaint uses "constructive discharge" not in the earlier-described sense that working conditions were so intolerable that she was effectively forced to resign, but in the equally permissible sense that her employer's announced decision really forced her to retire. After all, the law regularly uses the word "constructive" to describe situations in which the actual factual scenario (in this instance being forced to retire) is treated as carrying the same legal consequence as a different factual situation (which in this case would have been Seisser's firing).

Thus Seisser's assertion of her "forced retirement" connotes an adverse employment action equivalent to her actual termination. As *Patterson*, 853 F.2d at 1406 (citation omitted) teaches:

> [C]oerced resignation ... is treated in law as the equivalent of outright discharge, for reasons too obvious to dwell on.

While that case gives as an example of coerced resignation (identical for our purposes to "forced retirement") a quite different factual circumstance—one in which "the plaintiff's superior had forced him to resign by threatening to file criminal charges against him if he refused" (*id.,*

referring to *Watkins v. Milwaukee County Civil Serv. Comm'n*, 88 Wis.2d 411, 276 N.W.2d 775 (1979))—it makes clear that the test is one of voluntariness.[16] Thus the nomenclature used—whether actual termination or forced retirement or something else—makes no difference. Instead the salient issue is whether Seisser left her employment voluntarily or involuntarily.[17]

Of course, if Seisser could not demonstrate a genuine issue of fact as to whether she was truly "forced" to retire, summary judgment in Platz' favor would be appropriate. On that score P. Mem. 10 asserts that there was no "element of threat, coercion or duress" even in Seisser's version of her meeting with Thoren. But that conclusory statement draws an impermissible pro-Platz inference from Thoren's saying "no" to Seisser's question whether anything else might be done. To the contrary, a trier of fact could reasonably infer that Thoren's flat "no" answer to the existence of any other options to Seisser's early retirement (her version at her Dep. 47, 49, 53–54) was a take-it-or-leave-it response—inherently coercive.[18]

Neither *Henn*, 819 F.2d at 829 nor *Brown v. Ameritech Corp.*, 128 F.3d 605, 606–07 (7th Cir.1997), cited as authority at P. Mem. 11, undermines Seisser's claim. Those cases are inapposite primarily because each plaintiff there was given a choice of early retirement or continued employment. By contrast, only one "op-

---

**16.** See also the more extended discussion of involuntariness in *Henn v. National Geographic Soc.*, 819 F.2d 824, 828–29 (7th Cir.1987).

**17.** P. Mem. 3 mischaracterizes the issue by citing *Bragg v. Navistar Int'l Transp. Corp.*, 164 F.3d 373, 377 (7th Cir.1998) to support the proposition that "actual and constructive discharge [claims] based on the same termination ... are mutually exclusive." But as already indicated, that notion (not expressly put in those terms in *Bragg*) is irrelevant here—for Seisser does not claim "constructive discharge" as that term is most often used in the employment discrimination context and as so used in *Bragg*. As *Bragg*, 164 F.3d at 377 speaks of that common usage, "[c]onstructive discharge exists to give Title VII protection to a plaintiff who decides to

quit rather than wait around to be fired." But again, in this case Seisser swears that she was forced into retirement, not that she quit voluntarily.

**18.** One of the ironies of Platz' presentation is its introductory quotation (P.R. Mem.1) of the familiar passage from *Through the Looking Glass* in which Humpty Dumpty scornfully refers to what is now recognized standard practice in the patent law field ("every inventor can choose to be his or her own lexicographer"). In this instance it is Platz' counsel who have fallen victim to the tyranny of labels, seeking to restrict "constructive discharge" to a narrow mold without recognizing the legitimacy of another quite permissible variant usage.

tion" was given to Seisser: early retirement.[19] At a minimum Seisser has identified a genuine issue of material fact as to whether her disability caused an adverse employment decision.

In Platz' effort to paint itself out of that corner, its P.R. Mem. 5 argues that Thoren's intent to end Seisser's employment by "suggesting" retirement "is unremarkable on its face .... [because] [w]hat other possible intention can one have in suggesting early retirement?" That of course ignores the already-stated reasonableness of inferring from Thoren's statement that Seisser was not free to decline that purported "suggestion."

Next P.R. Mem. 6 says that Thoren's marking of "Dismissal" on Seisser's "Termination Report" was "inadvertent[ ]" and that because Seisser first saw the document during discovery it "can create a material fact in her favor [only if Seisser] is alleging that she was actually fired but did not know about it until over a year later." Wrong. Thoren's self-serving characterization of inadvertence need not be accepted by a factfinding jury, which can view the "Dismissal" entry as shedding light on Thoren's state of mind and as probative of whether Seisser had any choice other than to leave Platz.

Finally, P. Mem. 12 relatedly argues:

As it transpired, Seisser's decision was unfortunate, because if Seisser had simply said 'no' when she was asked to retire, this case would not exist. Perhaps Platz would have terminated her. Maybe they would have accommodated her in some other additional fashion. Or something entirely different might have occurred.

But that effort to thrust on Seisser the risk of having to gamble on whether her boss was being serious when he told her she had no option other then to accept early retirement is really outrageous. Platz itself freely admits that she could have been terminated had she not complied. Even apart from the fact that a factfinder could reasonably have found that "possibility" to be a certainty, given (1) Thoren's testimony that he intended to end Seisser's employment and (2) his having marked "Dismissal" instead of "Resignation" or "Mutual Agreement" on Seisser's "Termination Report," it is really unconscionable to expect any employee to flout what she reasonably viewed as her boss' ultimatum, taking her chances on whether the expected termination might be accompanied by other unpleasant consequences.

### Conclusion

When "[t]he record and all reasonable inferences that may be drawn from it are viewed in the light most favorable to" Seisser, as they must be (*Jovanovic v. In-Sink–Erator Div. of Emerson Elec. Co.,* 201 F.3d 894, 898 (7th Cir.2000)), it is an understatement to say that a reasonable juror could conclude that she was forced to retire. That of course poses (at a minimum) a genuine issue of material fact as to the fourth element in the *Foster* articulation of Seisser's proof requirements (see n. 14), so that Platz's summary judgment motion must be denied. This action is set for a status hearing at 9 a.m. May 18, 2000 to discuss procedures leading to a swift trial.

Indeed, the total unacceptability of Platz' Rule 56 effort—thrusting the burdensome task of LR 56.1 compliance on Seisser's counsel when the existence of such factual issues was so evident[20]—that

---

**19.** As Platz says, even while trying to put a different spin on the Thoren–Seisser conversation, Seisser "merely asked him a single time if there wasn't something else that might be done, and he said no" (P. Mem.10). Seisser's recollection of the conversation, which could surely be credited by a factfinder, portrays a flat-out ultimatum by Thoren—essentially *"I've* decided you're to take early retirement—and that's it."

**20.** Seisser's counsel ends the Argument section of his brief (S. Mem. 6, just before the Conclusion) this way:

The evidence that plaintiff was terminated by Thoren is so clear and overwhelming that defendant's argument that plaintiff voluntarily resigned following a "suggestion" by Thoren cannot be considered to be made in good faith.

stronger medicine is called for. This was purely and simply a motion that should never have been filed. If when the case goes to trial Seisser were to prove successful, her counsel will be able to recover the cost of that needless expenditure of effort as part of the regular award of fees. But if the ultimate result at trial were to favor Platz, this Court anticipates imposing on Platz the incremental cost of the current bootless Rule 56 motion—the amount by which the total time expended and expenses advanced by Seisser's counsel exceed what would have been incurred and advanced had the case gone directly to trial without being diverted into this Rule 56 dead end.[21]

---

Whether that itself reflects an indignant over-statement is open to dispute—but it simply cannot be gainsaid that *any* reasonable jury could come to that conclusion.

21. What has been said here should not be misunderstood as any expression of this Court's views as to how the parties' dispute should be resolved on the merits. Instead the whole point is that the case should have gone directly to a trial on the merits, rather than the resources of the parties and this Court being wasted on a Rule 56 motion that, given the mandate to credit Seisser's version, was doomed to failure.