Cezary GLEBOCKI, Plaintiff–
Appellant,

v.

CITY OF CHICAGO, et al.,
Defendants–Appellees.

No. 01–1243.

United States Court of Appeals,
Seventh Circuit.

Submitted March 19, 2002 *.

Decided March 19, 2002.

Rehearing En Banc Denied
April 29, 2002.

---

* After an examination of the briefs and the record, we have concluded that oral argument is unnecessary. Thus, the appeal is submitted on the briefs and the record. *See* Fed. R.App. P. 34(a)(2).

Before WOOD, JR., ROVNER, EVANS, Circuit Judges.

ORDER

In March 1998 Cezary Glebocki was fired on the last day of the probationary period of his employment with the Chicago Police Department, upon the unanimous recommendation of a review board that found him to be untruthful, easily angered, and resentful of authority. In February 1999 Glebocki initiated this lawsuit against

the City of Chicago, the city's Police Board, and three police officers (Superintendent Terry G. Hillard, Commander Richard C. Stevens, and Sergeant Joseph Fitzsimmons) alleging that the defendants had discriminated against him because of his Polish national origin in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000(e) *et seq.* ("Title VII"), the Illinois Human Rights Act, 775 ILCS 5/2–102 and 103 ("IHRA"), and the Chicago Municipal Code § 2–160–030 (C.M.C.). The district court dismissed the claims against the Police Board and the three individual defendants. The court also dismissed Glebocki's CMC claim for failure to exhaust his administrative remedies, but went on to find that Glebocki's Title VII and IHRA claims against the City survived dismissal. After further proceedings, the district court granted summary judgment for the City on the remaining claims. Glebocki appeals and we affirm.

## I.

Glebocki was hired by the City of Chicago as a probationary police officer in March 1997, and during his employment completed training at the police academy and in the field. During this probationary period, Glebocki became the subject of several investigations when his behavior raised several senior officers' concerns about his truthfulness and his abusive treatment of private citizens.

Glebocki's conduct was first called into question by a training supervisor at the academy, Sgt. Fitzsimmons, during a review of Glebocki's attendance records. In the initial weeks of training, Glebocki had submitted a request for a day off to attend his wife's naturalization ceremony, and Fitzsimmons denied the request, citing the police department's strict attendance policy. After this exchange Fitzsimmons reminded his classes that attendance at the

Academy was mandatory, and that the Academy allows absences only for serious and urgent reasons, not for weddings, family affairs, and naturalization ceremonies. Nevertheless on the day of the ceremony, Glebocki sought approval from a different supervisor, this time for only a few hours off. Although this supervisor granted Glebocki's request, he also instructed Glebocki to return to the academy after the ceremony, which Glebocki did not do. Upon learning of these events, Fitzsimmons confronted Glebocki, demanded that he submit a report explaining the absence, and initiated a complaint against Glebocki for disobeying his prior order denying permission to be absent. Glebocki claims that during their conversation, Fitzsimmons told him "you don't belong here." During the investigation of Fitzsimmons' complaint, one of Glebocki's instructors informed the investigator that Fitzsimmons had once told her that Glebocki was "clever and like a crook, not the kind who would take drugs or drug money from a dope dealer, but that would import stolen cars to Poland." Although Fitzsimmons was subsequently investigated for having made these statements, no charges were sustained against him. The investigation of Glebocki's conduct concluded with a recommendation that he be suspended for two days for failing to return to work after the ceremony.

Fitzsimmons investigated a second attendance infraction when Glebocki missed roll call at the academy because his attempts to repair a broken car window delayed him. Fitzsimmons ordered Glebocki to submit a report explaining why the repair was more urgent than reporting to work. He also inspected Glebocki's car to verify that the window had been broken. Fitzsimmons then issued a punishment report against Glebocki recommending a two-day suspension for being absent with-

out permission. When Glebocki appealed the punishment, it was reduced to a written reprimand.

While Fitzsimmons was inspecting the damage to Glebocki's car, he noticed that it was missing a city vehicle sticker. Glebocki explained that the sticker had been stolen from the car when the window was broken. Because department rules require recruits to conform to all city ordinances, Fitzsimmons requested an investigation of whether Glebocki drove his car without a proper sticker. During the ensuing investigation Glebocki made inconsistent and contradictory statements to the internal affairs officer, who also noted that throughout the inquiry Glebocki had been hostile, angry, and belligerent. The officer concluded that Glebocki not only drove the car without the sticker, but also gave false statements in an official investigation. Accordingly, he recommended that Glebocki be discharged.

This internal affairs officer was also assigned to investigate a verbal altercation between Glebocki and a private citizen that had been observed by an instructor at the academy. Once again, Fitzsimmons requested the investigation. Although the citizen—whose account was corroborated by a witness—claimed that Glebocki had shouted at him and that his behavior had been insulting, abusive, and intimidating, Glebocki denied that his conversation with the citizen had ever been rude or confrontational. The investigator charged Glebocki with discourteous treatment to a member of the public and recommended a three-day suspension.

Gleblocki became the subject of another complaint of discourteous treatment when a female civilian alleged that he followed her in his car while he was off-duty and yelled "are you f——ing crazy, give me your f——ing license, I'm the f——ing police." The investigator found insufficient evidence to sustain charges of unprofessional behavior, based on conflicting reports from the complainant and her passenger.

As Glebocki's probationary period approached its end, a panel of the Field Evaluation Review Board (FERB) convened to review Glebocki's performance and to make a recommendation to the Director of the Training Division. The FERB reviewed Glebocki's disciplinary records, field performance evaluations, and academic training, and considered statements submitted by personnel familiar with Glebocki's conduct and performance. Although Glebocki's instructor and field training officers had commented positively about him, overwhelmingly negative comments were submitted by Fitzsimmons, the various internal affairs officers who investigated Glebocki's conduct, and two of Glebocki's superior officers. Glebocki's own statement faulted Fitzsimmons for his disciplinary problems, and argued that had it not been for Fitzsimmons' discriminatory conduct in targeting him for unwarranted investigations, he would have completed the probationary period without incident or complaint. Ultimately the FERB unanimously recommended that Glebocki be terminated, based on its conclusion that Glebocki's conduct reflected that he had been untruthful and untrustworthy, consistently deceitful, unable to control his temper, and resentful of authority. Based on the FERB's findings, Glebocki's employment was terminated on March 16, 1998.

After filing a charge with the Equal Employment Opportunity Commission. Glebocki filed this federal complaint alleging that the defendants had subjected him to harassment based on his national origin and terminated his employment because of the same discriminatory animus. The district court first dismissed claims against the individual defendants and the Police

Board because Glebocki failed to allege they were his employer. The court then dismissed Glebocki's claim under the Chicago Municipal Code for failure to exhaust administrative remedies. After further proceedings the district court granted summary judgment for the City based on Glebocki's inability to show sufficient evidence of discriminatory harassment or that the City's genuine non-discriminatory reason for firing him was pretext.

## II.

■■■■ Under Title VII, an employer may not "discharge any individual, or otherwise ... discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's ... national origin." 42 U.S.C. § 2000e–2(a)(1). A plaintiff without direct evidence of national origin discrimination can avert summary judgment by employing the burden-shifting approach set out in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *See Olsen v. Marshall & Isley Corp.,* 267 F.3d 597, 600 (7th Cir.2001). Under this method of proof, the plaintiff bears the initial burden of establishing a *prima facie* case of discrimination. *Id.* To do this the plaintiff must show that (1) he is a member of a protected class; (2) he was meeting the employer's legitimate work expectations; (3) he suffered an adverse employment action; and (4) his employer treated similarly situated employees outside the protected class more favorably. *See Lalvani v. Cook County,* 269 F.3d 785, 789 (7th Cir.2001). Only if the plaintiff successfully produces evidence of a *prima facie* case does the burden then shift to the employer to articulate a legitimate, nondiscriminatory reason for the employment action. *Olsen,* 267 F.3d at 600. Finally, the burden shifts back to the plaintiff to prove that the employer's proffered reason was a pretext for discrimination. *Id.*

■■■■ The district court's summary judgment analysis implicitly presumed that Glebocki established a *prima facie* case, but concluded that Glebocki's discrimination claim ultimately faltered because he could not show pretext. Although pretext analysis may prove a more expedient way to resolve the question, this court has repeatedly emphasized that "the prima facie case under *McDonnell Douglas* must be established and not merely incanted." *Coco v. Elmwood Care, Inc.,* 128 F.3d 1177, 1178 (7th Cir.1997). Accordingly, we first inquire whether Glebocki actually established a *prima facie* case of national origin discrimination.

The City does not contest that Glebocki's Polish national origin qualifies as a protected class, or that he suffered an adverse action when he was fired. Thus we turn to the second prong of the *prima facie* test and examine whether Glebocki met the City's *bona fide* expectations. *See Robin v. Espo Eng'g Corp.,* 200 F.3d 1081, 1090 (7th Cir.2000). Glebocki claims that he met the City's legitimate expectations because he passed the qualifying exams, met all academic, physical, and range requirements, and received favorable performance reviews from his· field training supervisors. But as the City clearly states in its police training manual, it also expects its police officers to answer questions truthfully, behave courteously, and to respond to pressured situations appropriately. The review board unanimously concluded that Glebocki met none of these criteria. Glebocki attempts to refute the review board's findings by alleging that Fitzsimmons' participation somehow tainted the results. Yet Fitzsimmons exercised no control over the findings of the investigators, and several people other than Fitzsimmons presented the board

with evidence of Glebocki's deceptions and discourteous conduct. Without evidence that the review board was "being manipulated ... by a discriminating subordinate ... we are reluctant to allow the latter's discriminatory motive be imputed to the former." *See Wallace v. SMC Pneumatics, Inc.,* 103 F.3d 1394, 1401 (7th Cir. 1997).

Even if Glebocki's academic and other achievements were sufficient to meet the legitimate expectations of his employer, he also fails to satisfy the fourth prong of the test by showing that another "similarly situated" employee of a different national origin was treated more favorably. *See Foster v. Arthur Andersen, LLP,* 168 F.3d 1029, 1036 (7th Cir.1999): *Troupe v. May Dept. Stores Co.,* 20 F.3d 734, 739 (7th Cir.1994). Glebocki has not identified a single non-Polish cadet accused of verbally abusing members of the public, being absent without permission, driving without a valid city sticker, ignoring and disobeying orders, giving false statements, and refusing to cooperate, who was not subjected to an investigation or disciplined. His failure to identify a similarly situated employee not of Polish national origin thus also dooms his Title VII claim.

 Glebocki also claims he was a victim of a hostile work environment because he was Polish. To support his claim Glebocki cites three instances in which Fitzsimmons made allegedly discriminatory statements, and argues that Fitzsimmons treated him differently than other recruits in various ways: by closely scrutinizing his behavior, initiating numerous disciplinary investigations against him, and recommending unusually harsh discipline. To determine whether Fitzsimmons' conduct created an objectively hostile work environment, we consider the frequency and severity of the complained conduct, and whether it unreasonably interferes with a person's work performance or creates an intimidating, hostile, or offensive work environment. *See Hilt–Dyson v. Chicago,* 282 F.3d 456 (7th Cir.2002); *Ngeunjuntr v. Metropolitan Life Ins. Co.,* 146 F.3d 464, 467 (7th Cir.1998). We doubt Fitzsimmons' three remarks—albeit objectionable and offensive—amount to conduct so "severe or pervasive that a reasonable person would find it hostile," *Ngeunjuntr* 146 F.3d at 467. Furthermore, because Glebocki admits that he successfully completed the academic and field training requirements of his probationary employment, Fitzsimmons' alleged harassment cannot be said to have interfered with Glebocki's work performance. We conclude that Fitzsimmons' alleged conduct, while certainly inconveniencing Glebocki, did not create an objectively hostile work environment.

 Next Glebocki claims that the district court erred in dismissing claims against the Police Board, Hillard, Stevens, and Fitzsimmons. Title VII, however, does not impose individual liability on supervisory employees, *see Williams v. Banning,* 72 F.3d 552, 554 (7th Cir.1995), and there is no suggestion here that the Police Board falls within Title VII's definition of "employer."

Glebocki also attempts to raise for the first time on appeal a retaliation claim, as well as federal constitutional claims alleging that the City violated his rights under the First, Fourth, and Fifth Amendment. Since no such claims were ever raised in the district court, they are waived.

 Finally, the City claims that the district court erred when it held that it had jurisdiction to hear Glebocki's IHRA claim. We agree. The Illinois Human Rights Commission has exclusive jurisdiction over civil rights actions brought under the IHRA. *See Manley v. City of Chicago,* 236

F.3d 392 (7th Cir.2001); *see also* 775 ILCS 5/8–111(c) ("[N]o court of this state shall have jurisdiction over the subject matter of an alleged civil rights violation other than set forth in the Act."). Since the district court did not have jurisdiction to entertain Glebocki's IHRA claim in the first place, the judgment of the district court should have reflected a dismissal in part for lack of jurisdiction.

We agree with the court's decision in all other aspects. Accordingly, the judgment of the district court is AFFIRMED AS MODIFIED.