In the

# United States Court of Appeals

## For the Seventh Circuit

No. 15-2332

PEGGY ZAHN,

*Plaintiff-Appellant,*

*v.*

NORTH AMERICAN POWER & GAS, LLC,

*Defendant-Appellee.*

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division
No. 14 C 8370 — **Virginia M. Kendall**, *Judge.*

ARGUED DECEMBER 2, 2015 — DECIDED MARCH 4, 2016

Before KANNE and SYKES, *Circuit Judges*, and GILBERT, *District Judge.**

KANNE, *Circuit Judge*. Prior to 1997, Illinois did not have a competitive electricity market. Residents could only purchase power from the local public utility, whose rates were

*The Honorable J. Phil Gilbert, of the United States District Court for the Southern District of Illinois, sitting by designation.

regulated by the Illinois Commerce Commission ("ICC"). If a resident had a dispute regarding rates or charges and wanted to recover damages, then the resident had to file a claim against the public utility with the ICC because it had exclusive jurisdiction to hear such claims under the Public Utilities Act. *Sheffler v. Commonwealth Edison Co.*, 955 N.E.2d 1110, 1122–23 (Ill. 2011). The Illinois Supreme Court's historical justification for holding that the ICC has exclusive jurisdiction is the role it plays in reviewing and approving public utilities' rates. *Id.*

In 1997, the Illinois General Assembly decided to create a competitive electricity supply market. After the passage and implementation of the Electric Service Customer Choice and Rate Relief Law of 1997 ("Rate Relief Law"), residents could choose to buy electricity from their local public utility, an electric utility other than their local public utility, or an Alternative Retail Electric Supplier ("ARES"). Because the Rate Relief Law's intended effect was to partially deregulate Illinois's electricity market,[1] the ICC was not given ratemaking authority over ARESs. The law did, however, explicitly grant the ICC certain oversight responsibilities over ARESs. *See* 220 ILCS 5/16-115A–115B. What the Rate Relief Law did not do though was *explicitly* provide a mechanism by which res-

---

[1] Prior to the enactment of the Rate Relief Law, consumers purchased a "bundled" service from their local electric utility. *Commonwealth Edison Co. v. Ill. Commerce Comm'n*, 767 N.E.2d 504, 506 (Ill. App. Ct. 2002). This "bundled" service included: (1) electricity generation, *i.e.* supply, (2) distribution, and (3) delivery to a consumer's home. *Id.* The Rate Relief Law sought to "unbundle" these services. *Id.* Our concern here is only the first component—electricity suppliers.

idents could file a claim to recover damages from an ARES related to the rates it charged.

Plaintiff Peggy Zahn contends this omission was no accident. According to Zahn, Illinois lawmakers did not intend to give the ICC exclusive jurisdiction over claims like hers, *i.e.*, statutory fraud, breach of contract, and unjust enrichment claims due to overcharging by an ARES. Defendant North American Power & Gas, LLC ("NAPG"), an ARES, argues that the Rate Relief Law does provide Zahn her cause of action and remedy, and, therefore, the ICC has exclusive jurisdiction to hear her claims. The district court below agreed with NAPG and granted its motion to dismiss for lack of subject-matter jurisdiction, as well as for failure to state a claim.

The question of whether the ICC has exclusive jurisdiction to hear Zahn's claims presents an important question of Illinois state law on which the Illinois appellate courts appear in conflict. It is a question that most certainly will occur in future lawsuits unless resolved. Rather than decide it in the absence of controlling Illinois Supreme Court precedent and in the face of conflicting case law, we conclude the question before us is a candidate for certification to the Illinois Supreme Court.

Under Circuit Rule 52, we may sua sponte certify a question to a state court if "the rules of the highest court of a state provide for certification to that court by a federal court of questions arising under the laws of that state which will con-

trol the outcome of a case pending in the federal court."[2] Illinois Supreme Court Rule 20 provides in relevant part that certification to it is proper when "there are involved in any proceeding before [the Seventh Circuit] questions as to the law of this State, which may be determinative of the said cause, and there are no controlling precedents in the decisions of this court … ." Additionally, in evaluating whether a case is appropriate for certification, we have looked at whether the case "concerns a matter of vital public concern," involves an issue "likely [to] recur in other cases," and whether "the state supreme court has yet to have an opportunity [to] illuminate a clear path on the issue." *Plastics Eng'g Co. v. Liberty Mut. Ins. Co.*, 514 F.3d 651, 659 (7th Cir. 2008) (citation and quotation marks omitted). That is why questions tied to specific facts from a case are generally "not suitable for certification to a state's highest court." *State Farm Mut. Auto. Ins. Co. v. Pate*, 275 F.3d 666, 672 (7th Cir. 2001) (citation and quotation marks omitted).

All the requirements for certification are present here. First, should the Illinois Supreme Court determine that the ICC has exclusive jurisdiction over Zahn's claims, then Zahn has failed to state a claim in federal court. In other words, a decision from the Illinois Supreme Court could be outcome determinative. Second, the question at issue here requires application and interpretation of state utility law, as well as a determination on whether Illinois residents can bring claims against an ARES in state court. Such questions are undoubtedly of vital public concern. Third, this issue—unless re-

---

[2] Neither party at oral argument expressed any opposition to us certifying this controlling question of law to the Illinois Supreme Court.

solved by the Illinois Supreme Court—will likely be raised
by other ARESs who are sued by Illinois residents in state
and federal court. Finally, as we discuss below, the Illinois
Supreme Court has not "illuminate[d] a clear path on the is-
sue." *Plastics Eng'g Co.*, 514 F.3d at 659.

In reaching our decision to utilize certification, we initial-
ly examined the issue presented as set forth below.

## I.   BACKGROUND

When reviewing a motion to dismiss, we must accept all
facts in Zahn's complaint as true. *Crenshaw v. Baynerd*, 180
F.3d 866, 868 (7th Cir. 1999). In August 2012, Zahn decided
to purchase her electricity from NAPG, after receiving an
offer promising lower electricity rates. NAPG then sent Zahn
a letter in which it stated Zahn would receive its "New Cus-
tomer Rate" of $.0499 per kilowatt hour in her first month of
service. Thereafter, NAPG promised Zahn in the letter that
she would receive a "market based variable rate."

NAPG also sent Zahn an "Electricity Sales Agreement
Customer Disclosure Statement." NAPG stated that "[o]ther
than fixed and/or introductory/promotional rates, all rates
shall be calculated in response to market pricing, transporta-
tion, profit and other market price factors." Also in the
statement, NAPG disclosed under the heading "Open Price"
that its prices were "variable" based on "market prices for
commodity, transportation, balancing fees, storage charges,
[NAPG] fees, profit, [and] line losses … . Your price may be
higher or lower than Your [local public utility] … ." The
agreement's term was month-to-month.

Zahn never received NAPG's "New Customer Rate" of
$.0499 per kilowatt hour. Instead, NAPG charged her $.0599

per kilowatt hour in September and October 2012. And after those first two months of service, NAPG charged a rate higher than Zahn's local public utility, Commonwealth Edison Company ("ComEd"), during the period from November 2012 through June 2014. At times, NAPG charged nearly triple what ComEd would have charged Zahn.

Zahn filed a class-action complaint against NAPG in October 2014 in which she alleged violations of the Illinois Consumer Fraud and Deceptive Business Practices Act, breach of contract, and unjust enrichment. According to Zahn, NAPG engaged in a "classic bait-and-switch deceptive marketing scheme," luring customers with low teaser rates and promises of "market pricing." Those promises, Zahn contended, are misleading because NAPG's electricity rates are "substantially higher than market rates."

NAPG moved to dismiss Zahn's complaint for lack of subject-matter jurisdiction and failure to state a claim upon which relief can be granted pursuant to Federal Rules of Civil Procedure 12(b)(1) and (b)(6), respectively. The district court granted NAPG's motion to dismiss for lack of subject-matter jurisdiction, and in the alternative, for failure to state a claim. Zahn appealed.

## II. ANALYSIS

The district court, Zahn, and NAPG have characterized the question of whether the ICC enjoys exclusive jurisdiction over Zahn's claims as one of subject-matter jurisdiction. It is not. States do not have the power "to enlarge or contract federal jurisdiction." *Beach v. Owens-Corning Fiberglas Corp.*,

728 F.2d 407, 409 (7th Cir. 1984).[3] Only Congress has the constitutional authority to limit the district court's jurisdiction, which, in this case, would require the altering of 28 U.S.C. § 1332. *See Begay v. Kerr-McGee Corp.*, 682 F.2d 1311, 1316 (9th Cir. 1982); *Markham v. City of Newport News*, 292 F.2d 711, 713 (4th Cir. 1961).

States do, however, "have the power to prevent the federal court from granting relief in a diversity case by denying the substantive right of action asserted." *Begay*, 682 F.2d at 1315. That is because diversity actions "involve rights created by a state, rights which are subject to definition, limitation and, frequently, negation by the state." *Markham*, 292 F.2d at 713.

NAPG's argument that the district court lacked subject-matter jurisdiction is miscast. Zahn properly invoked the district court's diversity jurisdiction pursuant to 28 U.S.C. § 1332(d). NAPG's challenge is in fact one to the subject-matter jurisdiction of an Illinois state court. If an Illinois state court does not have jurisdiction to hear Zahn's claim, then Zahn has failed to state a claim upon which relief may be granted in a federal court sitting in diversity. *See Tacket v. Gen. Motors Corp., Delco Remy Div.*, 93 F.3d 332, 334 (7th Cir. 1996); *Beach*, 728 F.2d at 409.

---

[3] The district court relied in part on *Glebocki v. City of Chicago*, 32 F. App'x 149, 154–55 (7th Cir. 2002), for the proposition that a federal court sitting in diversity is without subject-matter jurisdiction if state law vests exclusive jurisdiction over a state-law claim with a state agency. *Glebocki* is an unpublished order that provides no precedential support for this conclusion.

We review *de novo* a district court's decision to dismiss for failure to state a claim upon which relief may be granted. *Jackson v. Bank of Am. Corp.*, 711 F.3d 788, 791 (7th Cir. 2013). In determining a complaint's sufficiency, "we construe it in the light most favorable to the nonmoving party, accept well-pleaded facts as true, and draw all inferences in her favor." *Reynolds v. CB Sports Bar, Inc.*, 623 F.3d 1143, 1146 (7th Cir. 2010) (quotation marks omitted). To survive a motion to dismiss, the plaintiff must allege "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). We need not, however, "accept as true any legal assertions or recital of the elements of a cause of action supported by mere conclusory statements." *Vesely v. Armslist LLC*, 762 F.3d 661, 664–65 (7th Cir. 2014) (quotation marks and citation omitted).

Because this is a diversity case, state substantive law controls, which means we will attempt to interpret and apply Illinois law. *Blood v. VH-1 Music First*, 668 F.3d 543, 546 (7th Cir. 2012). Because there is no Illinois Supreme Court decision on point, we must "use our own best judgment to estimate how the [Illinois] Supreme Court would rule as to its law." *Valerio v. Home Ins. Co.*, 80 F.3d 226, 228 (7th Cir. 1996). While not bound by decisions of Illinois's lower courts, we must still "give great weight to the holdings of the state's intermediate appellate courts and ought to deviate from those holdings only when there are persuasive indications that the highest court of the state would decide the case differently." *Allstate Ins. Co. v. Menards, Inc.*, 285 F.3d 630, 637 (7th Cir. 2002).

*A. History of ICC's Jurisdiction Over Reparation Claims*

Illinois enacted the Public Utilities Act in 1921, which established the ICC.[4] 1921 Ill. Laws 702. The Illinois Supreme Court has long recognized that the ICC "exists for the function of maintaining a balance between the rates charged by utilities and the services performed." *Vill. of Apple River v. Ill. Commerce Comm'n*, 165 N.E.2d 329, 332 (Ill. 1960). The ICC's role was then and still is to ensure that those rates are "just and reasonable." 1921 Ill. Laws at 722; 220 ILCS 5/9-201(c).

To accomplish this goal, Illinois vested in the ICC "very broad powers," including the power to "approve rates" of public utilities. *Vill. of Apple River*, 165 N.E.2d at 332. In determining whether rates are "just and reasonable," the ICC employs "technical data and expert opinion, as well as complex technological and scientific data, [which] make it essential that the matter be considered by a tribunal that is itself capable of passing upon complex data." *Sheffler v. Commonwealth Edison Co.*, 955 N.E.2d 1110, 1122 (Ill. 2011) (quotation marks omitted).

Illinois also expressly granted the ICC the power to hold hearings and decide complaints against a "public utility" alleged to have "charged an excessive or unjustly discriminatory amount for its product, commodity or service." 220 ILCS 5/9-252. Section 9-252 provides the ICC the authority to

---

[4] The predecessor to the ICC was the Illinois Public Utilities Commission, which was created by statute in 1913. 1913 Ill. Laws 459; *Valier Coal Co. v. Dep't of Revenue*, 143 N.E.2d 35, 36 (Ill. 1957) ("[T]he Illinois Public Utilities Commission [was the] predecessor of the present Illinois Commerce Commission.").

"order that the public utility make due reparation to the complainant therefor, with interest at the legal rate from the date of payment of such excessive or unjustly discriminatory amount." *Id.*

The Illinois Supreme Court has relied upon Section 9-252 along with the ICC's technical expertise in determining "just and reasonable" rates as the basis for holding that the ICC has "exclusive jurisdiction over rates" involving public utilities. *Sheffler*, 955 N.E.2d at 1122. This conclusion that the ICC has exclusive jurisdiction over reparation claims is not a new invention. The Illinois Supreme Court has long "recognized that the 'evident intent and purpose of the legislature in providing a method by which reparation may be recovered and in requiring that an application therefor shall be first made to the commission, precludes an action at law for such reparation until the commission has heard a claim therefor.'" *Id.* at 1123 (quoting *Terminal R.R. Ass'n of St. Louis v. Pub. Utils. Comm'n*, 136 N.E. 797, 799 (Ill. 1922)). That "exclusive jurisdiction over rates" also extends to complaints involving a public utility's "infrastructure and its provision of electrical services" because "rates and service are inextricably tied together." *Id.* at 1126, 1125.[5]

---

[5] The ICC's exclusive jurisdiction does not, however, extend to claims "when the essence of the complaint is that the utility has done something" other than "charged too much for a service." *Sheffler v. Commonwealth Edison Co.*, 955 N.E.2d 1110, 1123 (Ill. 2011). Illinois courts have referred to such an action as one for "civil damages" rather than for reparations. *See, e.g.*, *Flournoy v. Ameritech*, 814 N.E.2d 585, 587 (Ill. App. Ct. 2004). On appeal, Zahn does not argue that her claims fall within the "civil damages" category and therefore are exempt from the ICC's exclusive jurisdiction on those grounds.

*B. Statutory Interpretation*

Because the question before us involves the interpretation of an Illinois statute, we apply Illinois's rules of statutory construction. *Carter v. Tennant Co.*, 383 F.3d 673, 682 (7th Cir. 2004). Illinois's "primary rule of statutory construction is to ascertain and give effect to the intent of the legislature." *People v. Donoho*, 788 N.E.2d 707, 715 (Ill. 2003). There is no better indicator of that intent than the "clear language of the statute." *People v. NL Indus.*, 604 N.E.2d 349, 355 (Ill. 1992). Statutes must not be read in isolation but "as a whole; all relevant parts of the statute must be considered when courts attempt to divine the legislative intent underlying the statute." *Id.* at 356.

*1. Defining a "Public Utility" under the Public Utilities Act*

We begin with the text of the Rate Relief Law and Public Utilities Act. NAPG contends that it is a "public utility" within the meaning of the Public Utilities Act, and therefore, the ICC has exclusive jurisdiction over Zahn's claims. The ICC agrees with the conclusion that an ARES is a "public utility." *See Chiku Enters. Inc. v. GDF Suez Energy Res. NA, Inc.*, No. 10-0157, 2011 WL 1474049, at *8 (Ill. Commerce Comm'n Apr. 12, 2011) (stating that an ARES "engaged in furnishing utility services in Illinois" was "a public utility within the meaning of Section 3-105 [of] the Illinois Public Utilities Act"). So too does an Illinois appellate court, albeit implicitly and in an unpublished decision. *See SRT Enters, Inc. v. Direct Energy Bus., LLC*, No. 1-12-2760, 2013 WL 3379245, at *4–5 (Ill. App. Ct. June 28, 2013) (equating an ARES with a "public utility" for the purposes of Section 9-252).

Zahn has a different take and argues that a plain reading of the Public Utilities Act and Rate Relief Law reveals that the ICC has concurrent, not exclusive, jurisdiction over her claims. The Public Utilities Act does explicitly exclude ARESs from the definition of "public utility." 220 ILCS 5/3-105(b)(9)("'Public utility' does not include … alternative retail electric suppliers … ."). This particular revision to the definition of "public utility" was made in the Rate Relief Law, which created ARESs in the first instance. 1997 Ill. Laws 6195, 6264–65. Thus, the legislature may have intended to exclude ARESs from the ambit of other provisions applying to a "public utility" within the Public Utilities Act, including Section 9-252. As noted earlier, Section 9-252 states that the ICC has jurisdiction to hear reparation claims against a "public utility."

The Rate Relief Law's definitions and applicability section also suggest that Section 9-252 may not apply to ARESs. First, the Rate Relief Law states that an "electric utility" is "a public utility, as defined in Section 3–105 of this Act," which, as already discussed, specifically excludes an ARES from its definition. 220 ILCS 5/16-102. The legislature then excluded "electric utilities" from the definition of an ARES. *Id.* This definition could be read as the legislature deliberately distinguishing between an "electric utility" and an ARES for the purposes of the Rate Relief Law and the Public Utilities Act.

Second, the applicability section states, in relevant part, that the Rate Relief Law "appl[ies] to electric utilities and alternative retail electric suppliers as defined *in this Article*," that is, the Rate Relief Law. 220 ILCS 5/16-101(a) (emphasis added). The next sentence provides:

> Except to the extent modified or supplemented by the provisions of this Article, or where the context clearly renders such provisions inapplicable, the other Articles of the Public Utilities Act pertaining to public utilities, public utility rates and services and the regulation thereof, are fully and equally applicable to the tariffed services *electric utilities* provide.

*Id*. (emphasis added). The legislature appears to have made a decision to not only refer to "electric utilities" and ARESs separately but also to exclude ARESs from the sentence stating that the remainder of the Public Utilities Act would apply to "electric utilities." Such an omission suggests that the legislature may have intended for the remainder of the Public Utilities Act to apply only to "electric utilities" and not ARESs. *See Solich v. George & Anna Portes Cancer Prevention Ctr. of Chi., Inc.*, 630 N.E.2d 820, 822 (Ill. 1994) ("Where, as here, a statute lists the things to which it refers, there is an inference that all omissions should be understood as exclusions, despite the lack of any negative words of limitation.").

*2. The Legislature's Stated and Implied Intent*

Beyond the text, the parties argue the purpose for enacting this complicated deregulatory scheme supports their interpretation of the statute.

Zahn contends that the legislature's decision to forego providing a "comprehensive regulatory scheme to regulate ARESs," including a provision granting the ICC exclusive jurisdiction over reparation claims, makes sense given the reason for enacting the Rate Relief Law in the first place. (Appellant's Br. at 13.) According to Zahn, the legislature's

purpose in passing the Rate Relief Law was "to deregulate the electricity market to allow for competition." (*Id.*)

Zahn's interpretation of the legislature's intent here is plausible. In enacting the Rate Relief Law, the legislature stated that it wanted to allow Illinois consumers the choice to purchase their electricity from suppliers in a competitive market while assuring that they could still buy power from a traditional utility offering regulated rates. *See* 220 ILCS 5/16-101A(a)–(c); 220 ILCS 5/16-103. To do so, the legislature allowed traditional public utilities, referred to as "electric utilit[ies]," the opportunity to offer deregulated rates, so long as they continued to offer regulated rates within their previous service area. 220 ILCS 5/16-113 (process by which an "electric utility" has its service determined to be a "competitive"); 220 ILCS 5/16-103 (requiring an "electric utility" to offer regulated rates to its service area). It then allowed other market entrants, called ARESs, the chance to supply and sell electricity on the partially deregulated supply market. *See, e.g.,* 220 ILCS 5/16-115 (ARES certification process). The legislature also appears to have wanted to spare ARESs from the Public Utilities Act's provisions regulating utilities' rates. No party disputes that an ARES does not have to submit its rates to the ICC for approval under the "just and reasonable" standard. Yet, if the entirety of the Public Utilities Act applied to ARESs, an ARES like NAPG would be so required.

Also plausible is NAPG's position that the legislature wanted the ICC to have exclusive jurisdiction over reparation claims involving ARESs to assure that certain "safeguards" were in place to protect the "public's interest" as Illinois's competitive electricity market developed. *See* 220

ILCS 5/16-101A(c). In the Rate Relief Law's legislative findings, the legislature stated it wanted "[c]onsumer protections … in place to ensure that all customers continue to receive safe, reliable, affordable, and environmentally safe electric service" and for the ICC to "promote the development of an effectively competitive electricity market that operates efficiently and is equitable to all consumers." *Id.* at 5/16-101A(d). From this stated intent, NAPG concludes the ICC has the power to "govern ARESs and public utilities alike," and therefore, has exclusive jurisdiction to hear reparation claims. (Appellee's Br. at 7–8.)

*3. Safeguards, Consumer Protections, and Remedies*

The safeguards and consumer protections to which NAPG refers can be found in Sections 16-115A and 115B. 220 ILCS 5/16-115A–115B. Section 16-115A requires an ARES to, amongst other obligations, comply with requirements relating to adequate disclosure of pricing and terms and conditions of service in marketing materials and billing statements. And Section 16-115B(a) grants the ICC power to enforce violations of Section 16-115A while also providing that the ICC "shall have jurisdiction … to entertain and dispose of any complaint against any [ARES] alleging … that an [ARES] serving retail customers … has failed to provide service in accordance with the terms of its contract or contracts with such customer or customers."[6] Zahn's claims appear to

---

[6] As an aside, it should be noted that we are unsure if "retail customer" means a residential consumer like Zahn. The Rate Relief Law defines "retail customer" in relevant part to be:

> a single entity using electric power or energy at a single premises and that (A) either (i) is receiving or is eligible

(continued…)

fit into these categories, as her claims turn on whether NAPG falsely represented the rates it would offer consumers like her.

It is much less certain though whether the ICC has authority to order NAPG to pay reparations to Zahn for violating Section 16-115A or breaching its contract. To enforce violations of Section 16-115B and/or breaches of service contracts involving a "retail customer," the legislature gave the ICC the power to enjoin and/or fine an ARES. 220 ILCS 5/16-115B(b). The legislature did not, however, give the ICC explicit authority to order that financial remedies be made to *consumers* for such violations or breaches. Failure to provide a financial remedy for consumers may suggest that the ICC does not have *exclusive* jurisdiction over such claims. *See Getto v. City of Chicago*, 396 N.E.2d 544, 549 (Ill. 1979) (holding that where the ICC's jurisdiction was lacking in providing a consumer complete relief in its claim involving a telephone utility, the circuit court had jurisdiction).

NAPG insists, however, that the Rate Relief Law does provide a financial remedy for consumers—albeit implied. NAPG finds support for its contention in Section 16-115B's incorporation of Article X, which includes provisions "ad-

---

(…continued)

> to receive tariffed services from an electric utility, or (ii) that is served by a municipal system or electric cooperative within any area in which the municipal system or electric cooperative is or would be entitled to provide service under the law in effect immediately prior to the effective date of this amendatory Act of 1997.

220 ILCS 5/16-102.

dress[ing] the ICC's jurisdiction to issue orders granting or denying a consumer's rate relief." (Appellee's Br. at 12.) And NAPG contends that nothing in Section 16-115B states that financial penalties paid by an ARES for violating Section 115A or breaching its contract with a "retail customer" must go into the state coffers. The implication of these assertions is that Zahn could be the recipient of part or all of the proceeds from such a fine.

In contrast, Zahn sees Sections 16-115A–115B as supporting her position. As Zahn notes, Sections 16-115A and 115B specifically incorporate "Sections 8-201 through 8-207, 8-301, 8-505, or 8-507" of the Public Utilities Act, sections that address service obligations. 220 ILCS 5/16-115B(a)(iv). Through Sections 16-115A and 115B, the ICC has authority to hear complaints regarding failure to comply with those obligations and enjoin and or order financial penalties if a violation occurred. But, as Zahn points out, none of these sections address reparations for overcharging. The implication of Zahn's argument here and elsewhere in her briefs is that legislature intended the Rate Relief Law to be the sole source of law regulating ARESs, absent a specific incorporation by reference of other provisions from the Public Utilities Act. Such an argument has persuasive value because otherwise the legislature's specific incorporation of "Sections 8-201 through 8-207, 8-301, 8-505, or 8-507" would be redundant. *See Balmoral Racing Club, Inc. v. Topinka*, 778 N.E.2d 239, 243 (Ill. App. Ct. 2002) ("We will not interpret the statute in a manner that creates a redundancy.")

As for Article X, it appears to be, as Zahn suggests, "administrative in nature." (Appellant's Reply Br. at 12). Indeed, NAPG described Article X as "set[ting] out the procedure of

the ICC for hearing complaints by outlining its investigative powers, case management conferences, [and] hearing procedures." (Appellee's Br. at 12.) According to Zahn, NAPG's reliance on the provision in Article X stating that the ICC may issue orders "granting or denying interim rate relief" is misplaced. *See* 220 ILCS 5/10-201(a). Zahn views this provision "not [as] an independent grant of authority allowing the ICC to order rate relief in any instance," but instead as a "provision that allows for an appeal of a rate relief order in those circumstances in which the ICC is authorized to issue such an order." (Appellant's Reply Br. at 12.) No other provisions in Article X appear to vest substantive authority in the ICC to hear reparation claims.

In response to NAPG's assertion that Section 16-115B did not prohibit the ICC from ordering an ARES to make reparations to consumers for violating Section 16-115A or breaching its contract, Zahn directs us to 220 ILCS 5/4-203(d). That provision states, in relevant part, that "all other fines and civil penalties" other than those relating to "late filing of reports, taxes, or other filings," are to "be paid into the State treasury to the credit of the General Revenue Fund." *Id.* Such a statement by the legislature, according to Zahn, suggests that if the legislature wanted to allow the ICC to order reparations, it needed to do so explicitly in order to modify this general rule.[7]

---

[7] NAPG also appears to suggest both in its brief and at oral argument that because the ICC has resolved reparation claims against other ARESs, it has exclusive jurisdiction to do so here. (Appellee's Br. at 17 n.2.) Because this argument appears in a footnote and is underdeveloped, it is difficult to determine with precision what point it is trying to make. We

(continued…)

The foregoing statutory analysis does not resolve the question regarding whether the ICC has exclusive jurisdiction over Zahn's claims. While it appears the ICC has jurisdiction to hear complaints similar to Zahn's, it is by no means clear that it has exclusive jurisdiction over them. Nor does our analysis of the parties' arguments lead us to conclude that the ICC's jurisdiction is only concurrent with a state court's. We turn then to Illinois state precedent to see what, if any, light it may shed on this question.

*C. Illinois Court and ICC Application of Deregulatory Statutes*

We are unaware of any Illinois Supreme Court precedent directly addressing the question before us, and the parties do not direct us to such a decision. So, we turn to other Illinois precedent to see if it can guide our way.

NAPG relies principally on *SRT Enterprises, Inc. v. Direct Energy Business, LLC*, No. 1-12-2760, 2013 WL 3379245 (Ill App. Ct. June 28, 2013) and *Chiku Enterprises Inc. v. GDF Suez Energy Resources NA, Inc.*, No. 10-0157, 2011 WL 1474049 (Ill. Commerce Comm'n. Apr. 12, 2011) to support its contention that the ICC has exclusive jurisdiction here. *SRT Enterprises* appears to be the only Illinois appellate court to address the

---

(…continued)

hazard to guess that NAPG may be attempting to advance a legislative acquiescence argument. *See People ex rel. Birkett v. City of Chi.*, 779 N.E.2d 875, 881, 885 (Ill. 2002) (describing and applying the doctrine). Though it is not uncommon for an agency to exceed its statutory authority, *see, e.g.*, *Weingart v. Department of Labor*, 521 N.E.2d 913, 920 (Ill. 1988) (finding agency exceeded its statutory authority to hear a claim), we need not resolve NAPG's underdeveloped argument here, as the Illinois Supreme Court would be better positioned to evaluate this argument.

question before us. There, the appellate court assumed that Section 9-252 applied to ARESs in holding that the ICC has exclusive jurisdiction over consumer reparation claims against an ARES. *SRT Enters.*, 2013 WL 3379245, at *3.[8] It did so without reference to or consideration of the definition of "public utility" within the Public Utilities Act. Relying on this assumption, the court then cited to opinions applying Section 9-252 to conclude that "Sections 16–115A and 16–115B of the Act provide specific causes of action and remedies for plaintiff's claims. As a result, the statutory claim supersedes any common law claim based on the same facts." *Id.* at *6.

We are uncertain if the Illinois Supreme Court would follow the *SRT Enterprises* decision. The court did not discuss or consider that the legislature excluded an ARES from the definition of "public utility." It is possible that there is a policy justification for this decision, but the Illinois appellate court did not provide it or so indicate. We are unable to follow then how it determined an ARES was a "public utility" under Section 9-252 or how the consumer company was entitled to a remedy. Also giving us pause is that the consumer company in *SRT Enterprises* did not appear to raise the issue that the ICC did not have exclusive jurisdiction over claims involving ARESs in the first instance. Instead, it elected to argue that its claims were for civil damages—not repara-

---

[8] While NAPG relies on the unpublished district court decision in *SRT Enterprises v. Direct Energy Business, LLC*, No. 11 CV 4933, 2011 U.S. Dist. LEXIS 145999 (N.D. Ill. Dec. 20, 2011), for support, we do not view it as persuasive in light of the Illinois appellate court's decision on the same facts and issues.

tions—and thus not within the ICC's exclusive jurisdiction. *Id.* at *3. Therefore, the precise question before us was not presented to the appellate court. Finally, the decision is unpublished, meaning it is afforded less weight than a published decision. *See* Ill. Sup. Ct. Rule 23(e) (prohibiting parties from citing unpublished appellate decisions as "precedential"); *Osman v. Ford Motor Co.*, 833 N.E.2d 1011, 1016–17 (Ill. App. Ct. 2005) (recognizing that while Rule 23(e) prohibits parties from citing unpublished opinions as authority, it "does not bar the parties from using the reasoning and logic that an Illinois appellate court used in its unpublished decision.").

For similar reasons, we are also uncertain how the Illinois Supreme Court would view *Chiku Enterprises Inc. v. GDF Suez Energy Resources NA, Inc.*, No. 10-0157, 2011 WL 1474049 (Ill. Commerce Comm'n. Apr. 12, 2011). There, the ICC held in an interim order that it had jurisdiction to hear a dispute between an ARES and a commercial customer regarding its rates. *Id.* at *8. In so holding, the ICC found without any explanation that an ARES was a "public utility" under 220 ILCS 5/3-105, even though that exact provision *excludes* ARESs.

Like the *SRT Enterprises* court, it did not explain its reasoning for why an ARES was a "public utility" under Section 3-105, despite statutory language excluding it from the definition. And the parties in *Chiku Enterprises* did not argue that the ICC had exclusive jurisdiction over the claim, just that it had jurisdiction to hear the claim. We do not know then how much weight, if any, the Illinois Supreme Court would afford this decision.

Zahn asserts that *Wernikoff v. RCN Telecom Services of Illinois, Inc.*, 791 N.E.2d 1195 (Ill. App. Ct. 2003), is the more compelling appellate decision. There, the question was whether the ICC had exclusive jurisdiction over reparation claims between consumers and telecommunications carriers offering competitive services after the legislature partially deregulated the market. *Id.* at 1197. The court held that the ICC *did not* have exclusive jurisdiction over such claims. *Id.* at 1205.

The *Wernikoff* court observed that the legislature's deregulation efforts included "removing telecommunications companies from the Act's definition of 'public utility.'" *Id.* at 1198. That decision meant that the Public Utilities Act "was no longer generally applicable to telephone companies." *Id.* Instead, the legislature "selectively chose which provisions of the [Public Utilities Act] would still be applicable." *Id.* Also persuasive to the *Wernikoff* court was that "nearly all of Article IX of the [Public Utilities] Act, which deals with rates was not made applicable," thereby relieving the ICC of responsibility for determining whether the competitive telephone companies' rates were "just and reasonable." *Id.* at 1199. Finally, the court thought the legislature's decision to create "different regulatory schemes for competitive and noncompetitive telephone companies" also suggested that it did not intend for the ICC to have exclusive jurisdiction over reparation claims involving competitive providers. *Id.* at 1204.

What the *Wernikoff* court found persuasive about the legislature's intent to throw open the Illinois circuit court doors for reparation claims against competitive telephone companies also appears present with respect to ARESs. The legisla-

ture here excluded ARESs from the definition of "public utility" and selectively made applicable other portions of the Public Utilities Act to ARESs, just as it did with telecommunications companies. The legislature also did not apply any of Article IX—the article that deals with rate approval and reparations—to ARESs, just as it did not apply most of that article to competitive telecommunication services. And, the legislature created a different regulatory scheme for an ARES and a non-competitive electric utility in the Rate Relief Law, just as it did with telecommunication companies. *See* 220 ILCS 5/16-115–115B (detailing the obligations of an ARES and the ICC's oversight of an ARES).

There is, however, a critical difference between the legislative scheme at issue in *Wernikoff* and the Rate Relief Law—the type of utility being regulated. Electricity is more a basic necessity than telephone service. As such, electricity gets different treatment. That is apparent from reviewing Article VIII of the Public Utilities Act relating to service obligations where several sections address and impose specific service obligations on electricity (and natural gas) suppliers, including additional requirements during the winter months. *See, e.g.,* 220 ILCS 5/8-202, 220 ILCS 5/8-203.

Perhaps, just as important for our purposes though is that *Wernikoff* is an Illinois appellate court decision. It has not been reviewed by the Illinois Supreme Court, nor has its holding been relied upon or even addressed by other Illinois appellate courts. So, the Illinois Supreme Court may view *Wernikoff* as limited by its facts or reject its holding outright. We are wary of deciding such a vital question of state law based on this decision, especially in light of the Illinois Supreme Court's longstanding recognition of the ICC's exclu-

sive jurisdiction over reparation claims.[9] *See Sheffler v. Commonwealth Edison Co.*, 955 N.E.2d 1110, 1123 (Ill. 2011) (citing *Terminal R.R. Ass'n of St. Louis v. Pub. Utils. Comm'n*, 136 N.E. 797, 799 (Ill. 1922)).

### III.  CONCLUSION

Based on the foregoing, we respectfully request the Illinois Supreme Court to answer the following controlling question of law:

> Does the ICC have exclusive jurisdiction over a reparation claim, as defined by the Illinois Supreme Court in *Sheffler v. Commonwealth Edison Company*, 955 N.E.2d 1110 (Ill. 2011), brought by a residential consumer against an Alternative Retail Electric Supplier, as defined by 220 ILCS 5/16-102?

We invite the justices of the Illinois Supreme Court to reformulate this question should they find it necessary. Of course, nothing in this certification opinion can or would seek to limit the scope of the Illinois Supreme Court's inquiry.

---

[9] As an alternative argument, NAPG contends that the ICC has "primary jurisdiction" because of its "special expertise to analyze, investigate, and, if necessary, prescribe the 'just and reasonable' rates that must be charged by an ARES." (Appellee's Br. at 24–25.) Therefore, according to NAPG, the district court should "refrain from adjudicating a case until an administrative agency that has special competence in a regulated industry … has first reviewed the matter." (*Id.* at 24.) We need not resolve this question today, as we do not yet know if Zahn has even stated a claim. Should the Illinois Supreme Court decide to resolve the question on this prudential basis, then we will apply its decision.

The Clerk of this Court will transmit the briefs and appendices in this case to the Illinois Supreme Court, together with this opinion. Upon the request of the Illinois Supreme Court, the Clerk will transmit all or any part of the record as that Court so desires. Further proceedings in this Court are stayed while this matter is under consideration by the Supreme Court of Illinois.

QUESTION CERTIFIED