In the

# United States Court of Appeals

## For the Seventh Circuit

No. 18-3082

CHETTY SEVUGAN, individually and on behalf of others simi-
larly situated,

*Plaintiff-Appellant,*

*v.*

DIRECT ENERGY SERVICES, LLC,
a Delaware Corporation

*Defendant-Appellee.*

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division
No. 1:17-cv-06569 — **Virginia M. Kendall**, *Judge.*

ARGUED MARCH 26, 2019 — DECIDED JULY 26, 2019

Before BAUER, ROVNER, and BRENNAN, *Circuit Judges.*

BRENNAN, *Circuit Judge.* Unhappy with his utility bill,
Chetty Sevugan filed this putative class action challenging the
electricity prices of Direct Energy Services, LLC, an alterna-
tive retail energy supplier in the Chicago market. After
Sevugan's third attempt to plead a breach of contract claim,
the district court dismissed his complaint with prejudice.

Repetition does not make a claim more valid; just so for the customer here. Given his failure to allege facts which allow a reasonable inference that the parties' contract was breached, his claim is not facially plausible, so dismissal was proper.

**I**

This case comes to us after a grant of a motion to dismiss, so "[w]hen evaluating the sufficiency of the complaint, we construe it in the light most favorable to the nonmoving party, accept well-pleaded facts as true, and draw all inferences in [the nonmovant's] favor." *Reger Dev., LLC v. Nat'l City Bank*, 592 F.3d 759, 763 (7th Cir. 2010).

For decades, regulated, vertically-integrated utilities dominated the U.S. electricity market. These utility companies (in Illinois, Commonwealth Edison Company or "ComEd") generated, transmitted, distributed, billed, and collected payments for electricity. ComEd's rates are set by the Illinois Commerce Commission, a state regulatory agency.

More than twenty years ago, Illinois restructured its electricity market by the Electric Service Customer Choice and Rate Relief Law of 1997, 220 ILL. COMP. STAT. ACT 5, ART. XVI, which allows alternative retail electric suppliers to compete with ComEd and against each other to service retail customers, both residential and commercial. Unlike ComEd, alternative retail electric suppliers set their own rates and are not regulated by the Illinois Commerce Commission. ComEd (which in the 1990's divested itself of its power plants) and alternative suppliers serve as middlemen, purchasing electricity wholesale from PJM Interconnection LLC—a regional transmission organization that controls the electric grid

covering northern Illinois and several other states—and re-selling it to customers.

Today, Illinois retail consumers choose their electricity supplier from among ComEd and a collection of state-certified alternative retail electric suppliers serving their area. ComEd serves as the default energy provider; consumers who wish to buy from an alternative supplier must "opt-in" to that alternative supplier.

Direct Energy is one such alternative retail electric supplier. Sevugan, hoping to save money on his monthly electric bills, contracted with Direct Energy in 2011. Sevugan's allegations center on two clauses in his contract with Direct Energy. The first, which we call the "Terms Clause," explains the contract's pricing terms:

> **3. Pricing, Billing and Payment Terms.** During the Initial Term, you will pay Direct Energy for your electric generation services a price set for the Initial Term … . This price includes electric generation service and transmission charges … . *Electric generation service prices of electric suppliers, such as Direct Energy, are set competitively and are not regulated by the Commission … .*

(emphasis added).

The contract required Direct Energy to supply electricity at a fixed price per kilowatt hour (kWh) for the first twelve months. At the end of that initial term, Sevugan renewed for an additional twelve months at a lower fixed rate. In 2013, though, Sevugan neither re-enrolled nor cancelled service, which triggered what we will call the "Renewal Clause":

**5. Renewal: Notice of a Change to this Agreement.** Upon completion of the Initial Term, this Agreement will automatically renew on a month-to-month basis at a variable price per kWh with no early cancellation fee. *Direct Energy will charge you at a variable price per kWh based upon generally prevailing market prices for electricity in the PJM market at the Electric Utility load zone for the applicable period, plus an adder, determined solely by Direct Energy in its discretion.*

(emphasis added). Per the Renewal Clause, Sevugan's contract automatically renewed on a month-to-month basis, with his price set at a variable rate.

After several years as a customer, Sevugan became unhappy with his electricity costs, believing them to be above market rates and more expensive than if he had remained with ComEd. He cancelled service with Direct Energy and sued in September 2017, alleging Direct Energy deceived him (and others like him) in the parties' four-page form contract.

Sevugan made a variety of claims in his lawsuit,[1] asserting that after his fixed-rate term expired, the variable charges should have been based on market-related factors. He claimed the rates he paid did not reflect changes in wholesale-market prices and failed to correspond to rates offered by ComEd. Direct Energy moved to dismiss, arguing that Sevugan did not plausibly allege that the parties' contract

---

[1] Ten days after Sevugan filed his initial complaint, but before Direct Energy responded, Sevugan amended his complaint, apparently to delete references to New York's Civil Practice Laws and Rules. This first amendment did not alter Sevugan's substantive allegations or claims.

made those promises. In a thorough opinion, the district court dismissed Sevugan's breach of contract claim without prejudice under FED. R. CIV. P. 9(b) and 12(b)(6), concluding that Sevugan failed to allege enough facts to show that Direct Energy plausibly breached a contractual duty.

As the dismissal was without prejudice, Sevugan filed a second amended complaint, which asserted only that Direct Energy breached paragraphs 3 and 5 of the parties' contract by: "(a) fail[ing] to base its prices upon generally prevailing market prices for electricity in the PJM market at the Electric Utility load zone for the applicable period, (b) fail[ing] to provide a competitive rate, (c) increas[ing] its adder[2] to an unreasonable level, or (d) all of the above."

Direct Energy again moved to dismiss, contending Sevugan's breach of contract claim was too speculative and lacked sufficient factual allegations. In a second detailed opinion, the district court again dismissed Sevugan's case, this time with prejudice. The court concluded Sevugan did not allege facts showing Direct Energy's rates were not "based on generally prevailing market prices," as the complaint pleaded only the prices of ComEd and the PJM market. The complaint was silent on rates charged by other Illinois alternative retail energy suppliers, which the district court considered Direct Energy's competition. The court further ruled that the

---

[2] Although not defined in the parties' contract, an "adder" can be described as a discretionary component of the electricity price. In his briefs, Sevugan presumes an "adder" is a charge in addition to the base price (whether that base was variable or fixed) that is "fixed and reflects all non-energy costs to provide service to its customers."

contract did not promise to charge rates lower than ComEd, so a breach of contract had not been alleged.

The district court also held that Sevugan failed to include facts showing the "adder" Direct Energy charged was "unreasonable." Sevugan failed to allege the amount of the adder, what percentage of the variable rates the adder constituted, or the adders charged by other suppliers. Without any such facts, the district court concluded Sevugan's pleaded claim was deficient.

Likewise, the district court rejected Sevugan's argument that Direct Energy breached by not setting its variable rates "competitively." Sevugan failed to allege the prices of any other alternative retail energy suppliers, making it impossible to know whether Direct Energy's pricing of its variable rates were competitive in the variable market. The district court explained that factual allegations regarding ComEd's prices were insufficient, as they are set by regulators, not the market.

Sevugan timely appealed from the second dismissal, which we review de novo. *Reger Development, LLC*, 592 F.3d at 763.

## II

To survive a motion to dismiss, a complaint must plead more than conclusions; it must allege sufficient facts that make the plaintiff's claim plausible. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *see also West Bend Mut. Ins. Co. v. Schumacher*, 844 F.3d 670, 675 (7th Cir. 2016) (setting forth principles governing assessment of complaint after Rule 12(b)(6) dismissal).

"'Plausibility' is not a synonym for 'probability' in this context, but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Schumacher*, 844 F.3d at 675 (citations omitted).

Under this standard, a plaintiff who seeks to survive a motion to dismiss must "plead some facts that suggest a right to relief that is beyond the speculative level." *In re marchFIRST Inc.*, 589 F.3d 901, 905 (7th Cir. 2009) (internal quotation marks omitted). While detailed factual allegations are not necessary to survive a motion to dismiss, it does require "more than mere labels and conclusions or a formulaic recitation of the elements of a cause of action to be considered adequate." *Bell v. City of Chicago*, 835 F.3d 736, 738 (7th Cir. 2016) (internal quote marks omitted).

The law of Illinois, the forum state, applies in this diversity case. *Fednav Intern. Ltd. v. Continental Ins. Co.*, 624 F.3d 834, 838-39 (7th Cir. 2010). "Under Illinois law, a plaintiff looking to state a colorable breach of contract claim must allege four elements: '(1) the existence of a valid and enforceable contract; (2) substantial performance by the plaintiff; (3) a breach by the defendant; and (4) resultant damages.'" *Reger Dev., LLC v. Nat'l City Bank*, 592 F.3d 759, 764 (7th Cir. 2010) (quoting *W.W. Vincent & Co. v. First Colony Life Ins. Co.*, 814 N.E.2d 960, 967 (Ill. App. Ct. 2004)). The district court concluded Direct Energy failed to plausibly allege facts from which to reasonably infer the third element, breach.

A breach of contract claim requires an identifiable breach of a contract term. *Harvey v. Mackay*, 440 N.E.2d 1022, 1027 (Ill. App. Ct. 1982) (dismissing complaint because "[t]here are no facts alleged which purport to show what acts constitute a breach"); *Talbert v. Home Sav. of Am., F.A.*, 638 N.E.2d 354, 358

(Ill. App. Ct. 1994) ("A breach can only exist where a party fails to carry out a term, promise, or condition of a contract; a breach cannot result from a party's performance of a contract term."). We review Sevugan's pleading on the contractual terms he claims Direct Energy breached, first the Renewal Clause (paragraph 5), including whether Direct Energy's adder is an unreasonable charge, and then the Terms Clause (paragraph 3).

## A

The parties agree the Renewal Clause establishes two parts to the contract price: (1) a "generally prevailing market price for electricity in the PJM market," plus (2) "an adder"; the sum of these two parts is the retail price. Sevugan first contests how Direct Energy exercised its discretion in setting electricity rates.

Sevugan interprets "generally prevailing market price" to mean Direct Energy was required to set its variable rates lower than the PJM wholesale price, as well as below ComEd's prices. To support this reading, Sevugan included a chart in this latest complaint. The chart lists the PJM wholesale market price and the rates per kWh, for each billing period, charged by Direct Energy and ComEd. Sevugan contends the chart shows that Direct Energy's rates were consistently higher than ComEd's, although both prices fluctuated in comparison to the wholesale price.

But Sevugan's complaint lacks a critical feature of comparison: it does not contain a valid comparator against which to measure "generally prevailing market prices." The complaint contains allegations concerning the PJM wholesale price. But that is the price to the energy companies, not the consumer.

Individual customers like Sevugan could not go out and purchase electricity at the PJM rate, no matter their electricity supplier. So, the PJM wholesale price is not a proper comparator price.

Sevugan's latest complaint includes a different chart that illustrates why the PJM wholesale price is not a sound comparator. That graphic shows that in early 2014, Direct Energy and ComEd each charged consumers prices below the wholesale rate, and that between 2013 and 2016 ComEd's price per kWh was consistently higher than the PJM wholesale price.

Sevugan's second proposed comparator, ComEd, is also not valid for assessing the "generally prevailing market price for electricity." The Illinois Commerce Commission sets ComEd's rates, excluding them from market forces. The Second Circuit recently considered whether a public utility is a proper comparator:

> If we were to hold private electricity suppliers liable for departing from the Standard Service Rates [the Illinois Commerce Commission equivalent], we would in effect make those [] rates binding on private electricity suppliers on Direct Energy. Yet the entire point of electricity deregulation was to allow the market, rather than the [state regulator], to determine rates.

*Richards v. Direct Energy Serv., LLC*, 915 F.3d 88, 99 (2d Cir. 2019) (internal citations removed and footnote omitted).[3] The

---

[3] While the contract terms in *Richards* differed somewhat from those here (and discovery had already taken place), the Second Circuit's reasoning in *Richards* stands unrebutted that a public utility is not a relevant comparator in these circumstances.

entire point of Illinois's rate relief law was to permit the rates of alternative retail energy suppliers to diverge from ComEd's rates, allowing them to fluctuate according to market conditions. In contrast, ComEd's regulated rates change only according to the directives of the Illinois Commerce Commission.

To argue ComEd suffices as a comparator, Sevugan relies on *Zahn v. North American Power & Gas, LLC*.[4] The consumer-plaintiff in *Zahn* also alleged breach of contract by an alternative retail energy supplier for purportedly overcharging for electricity. Sevugan points out this court ruled it was "plausible" to conclude that the legislative intent of Illinois's Rate Relief Law as "to deregulat[ing] the electricity market to allow for competition." 815 F.3d at 1090. To Sevugan, it follows that "Direct Energy competes with ComEd, and not other ARESs [alternative retail energy suppliers], to get consumers to switch."

But Sevugan's reliance on *Zahn* is misplaced, as that case involved a very different claim. Zahn alleged her alternative retail energy supplier induced her to switch electricity suppliers through false promises of a teaser rate, which she never received. 815 F.3d at 1086. After certifying to the Illinois Supreme Court the question whether the Illinois Commerce Commission had exclusive jurisdiction over her claim, 815 F.3d at 1095, and receiving the answer that it did not, 72 N.E.2d at 340, this Court concluded Zahn plausibly stated a claim for such bait-and-switch conduct. 847 F.3d at 878. Here,

---

[4] 815 F.3d 1082 (7th Cir. 2016), *certified question answered*, 72 N.E.3d 333 (Ill. 2016), *reh'g denied* (Jan. 23, 2017), *conforming to answer to certified question*, 845 F.3d 875 (7th Cir. 2017).

by contrast, Sevugan does not contest that he received the fixed rates for which he contracted for the first two years of his contract. This court's opinion in *Zahn* said nothing about Sevugan's theory that ComEd's prices are a valid method to determine the "generally prevailing market price for electricity."

ComEd's price is not a market price at all; it is a regulated price. Neither PJM nor ComEd participate in the general market for electricity, and thus they are not proper comparators with Direct Energy to gauge market price. The only other actors in the electricity market engaging in price competition are the other alternative retail energy suppliers in Illinois—the companies most similarly situated to Direct Energy. But none of Sevugan's complaints offered allegations about those suppliers' rates in comparison with Direct Energy's. The closest Sevugan got to pleading such information was in his second amended complaint, in which he alleged Direct Energy's "prices are substantially higher than not only ComEd's prices but also other ARES's [alternative retail energy supplier's] prices." But without additional supporting factual allegations, this conclusory claim is not sufficient to allow a reasonable inference that Direct Energy breached the Renewal Clause. *Bell*, 835 F.3d at 738. Further, Sevugan admits he has not pleaded any facts about what an alternative retail energy supplier would charge; he argues he does not need them. With nothing pleaded about the prices of Direct Energy's competitors, Sevugan's complaint does not contain sufficient facts to allow a reasonable inference Direct Energy breached the Renewal Clause.

At bottom, Sevugan's claim that Direct Energy did not charge rates commensurate with ComEd, or with the

wholesale price of PJM, fails to allege a breach. The parties' contract does not require Direct Energy to charge such rates. Without any information about valid market comparators, such as other alternative retail energy suppliers, Sevugan's breach of contract claim is speculative and implausible.

**B**

Sevugan next claims Direct Energy breached the contract by using an unreasonable adder. Recall, the Renewal Clause dictates the contract price is the generally prevailing market price plus the discretionary adder set by Direct Energy. Sevugan alleges the amount of Direct Energy's adder is unreasonable, resulting in overcharges. As part of his argument he asserts the "adder is fixed and does not fluctuate over time." From this, Sevugan contends that, because Direct Energy's kWh prices exceeded ComEd's (and did not decrease when ComEd's prices dropped), Direct Energy could not have charged him rates based on generally prevailing market prices, and thus breached the contract. To the extent Direct Energy did charge him such rates, Sevugan argues Direct Energy's "excessive prices could only have resulted from charging an unreasonable adder," which also would violate Illinois contract law that implies a price must be a reasonable one where a contract for goods or services is silent on that term. *See Protestant Hosp. Builders Club, Inc. v. Goedde*, 424 N.E.2d 1302, 1305 (Ill. App. Ct. 1981).

Unpacking this argument shows it is not well grounded. Sevugan's allegations about the size of the adder presumes it is fixed over time. But Sevugan provides no basis for this "fixed adder" theory. In the district court, Sevugan pointed to a contract with a municipal client, and a checklist for contracts with commercial clients, each of which referred to a "fixed

adder." But if anything, such allegations make it less likely Sevugan's adder was fixed, as Direct Energy explicitly referred to fixed adders in other contracts, but not in Sevugan's.

On appeal, Sevugan backs away from this fixed adder theory. He submits "[w]hether [Direct Energy]'s adder is fixed or not is very much beside the point." He says his allegations on this topic were "merely [his] attempt, and a very uncertain one at that, to explain the disparity between Direct Energy's retail price and the known PJM wholesale price." Given the incorrect comparator, though, this contrast is insufficient, as detailed above.

All the more, the Renewal Clause in the parties' contract grants Direct Energy price-setting discretion. The complaint fails to allege how Direct Energy unreasonably exercised its discretion in setting the adder amount (other than its claim that the prices were greater than ComEd and the PJM wholesale price, found wanting above).

Sevugan has offered no new arguments for how the adder in the price is unreasonable. He admits he does not know how the adder charge is established, or how Direct Energy formulated its prices. Nor does Sevugan allege Direct Energy's adder was greater than that charged by other market participants. Sevugan has not plausibly alleged Direct Energy charged him unreasonably for this component of the price.

## C

Finally, Sevugan disputes the electricity prices Direct Energy set by invoking a different portion of the contract, the Terms Clause, paragraph 3. As relayed above, that clause provides in part: "Electric generation service prices of electric suppliers, such as Direct Energy, are set *competitively* and

are not regulated by the Commission … ." (emphasis added).

The district court held that this term did not relate to Direct Energy's pricing, so it could not obligate Direct Energy's setting of its variable rates. To the court, "competitively" described the method in which prices are set—independently, by privately operated providers—rather than the term establishing a contractual obligation about the price itself.

Sevugan argues "competitively" in the Terms Clause means Direct Energy was contractually bound to set a variable rate competitive with ComEd's price. Sevugan relies on dictionary definitions of "competitive" and similar terms to contend he has stated a plausible claim by alleging that Direct Energy's prices "were exorbitantly higher than ComEd and therefore not 'competitively' set—contravening the terms of the contract."

Sevugan's arguments fare no better on appeal than in the district court. Unambiguous terms are to be given their plain, ordinary, and popular meaning. *See Thompson v. Gordon*, 948 N.E.2d 39, 47 (Ill. 2011) (citing *Cent. Ill. Light Co. v. Home Ins. Co.*, 821 N.E.2d 206, 213 (Ill. 2004) (same)). The Terms Clause read plainly does not promise Direct Energy's rates will be similar to ComEd's; in fact, it warns customers they may be significantly different. "Competitively" explains that Direct Energy's rates are unregulated by a public rate commission, unlike ComEd's rates set by the Illinois Commerce Commission.

A contract should be construed as a whole. *Hongbo Han v. United Cont'l Holdings, Inc.*, 762 F.3d 598, 602 (7th Cir. 2014)

(holding "a court must give meaning and effect to every part of the contract," interpreting Illinois law in putative class action); *Gallagher v. Lenart*, 874 N.E.2d 43, 58 (Ill. 2007) ("[B]ecause words derive their meaning from the context in which they are used, a contract must be construed as a whole, viewing each part in light of the others.") (citation omitted); *see* ANTONIN SCALIA & BRIAN A. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 167 (2012) ("The text must be construed as a whole."). The Renewal Clause fixes Direct Energy's obligations when setting variable rates. But as the district court noted, the Terms Clause refers only to the fixed rate during the twelve-month initial term, so it may not even apply to a later variable rate charged under the Renewal Clause.[5]

Even if the Terms Clause did control pricing, Sevugan again has failed to plausibly allege Direct Energy improperly set its variable rate for electricity. As described above, the complaint contains no references to proper comparators, including alternative retail energy suppliers. Sevugan's contention that the variable rates he paid were not competitive because they were higher than ComEd's rates does not speak to Direct Energy's competitiveness in the broader market.[6]

---

[5] The cases Sevugan cites on this point differ materially from this one. We distinguished *Zahn* above. And *Oladapo v. Smart One Energy, LLC*, No. 14 CV 7117-LTS, 2016 WL 344976 (S.D.N.Y. Jan. 27, 2016), involved more specific language than that used in Sevugan's contract, such as a "guarantee" and a promise that the energy supplier would set prices "in response to changing market conditions." *Id*. at *3.

[6] Sevugan submits as persuasive supplemental authority *Mercado v. Verde Energy USA, Inc.*, No. 18 CV 2068, 2019 WL 978531 (N.D. Ill. Feb. 28, 2019), in which the district court denied a motion to dismiss based on

**III**

Sevugan's complaints failed to contain allegations from which it can be reasonably inferred Direct Energy breached the parties' contract. Because his claim is not facially plausible, we AFFIRM the district court's dismissal of this case.

---

allegations that variable rates were not priced according to market conditions. *Mercado* is not convincing because the contract language in that case did not give the supplier discretion in setting rates, *id*. at *2, as Direct Energy has here. Further, the district court in *Mercado* did not apply the plausibility standard at the center of our evaluation in this case. *See id.* at *4.